UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CATHOLIC LEGAL IMMIGRATION NETWORK, INC. (CLINIC), et al.,<br><br>Plaintiffs,<br><br>-v-<br><br>MARCO RUBIO, *in his official capacity as Secretary of State*, et al.,<br><br>Defendants. | 26-CV-00858 (JAV)<br><br><u>OPINION AND ORDER</u> |

JEANNETTE A. VARGAS, United States District Judge:

On January 14, 2026, the United States Department of State ("DOS") announced that, effective January 21, 2026, it would suspend the issuance of immigrant visas to nationals of 75 countries (the "Announcement"). ECF No. 48-1 at 2. The Announcement explained that DOS deemed immigrants from those 75 countries to pose a high risk of utilizing welfare or becoming a public charge. *Id.*

That same day, Secretary of State Marco Rubio ("Secretary Rubio") transmitted a cable (the "Cable") to all diplomatic and consular posts, directing consular officers to implement this new policy on January 21, 2026. ECF No. 63 ("Admin. Rec.") at 2-5. Consular officers were ordered to refuse immigrant visas to nationals of the 75 designated countries, regardless of whether the consular officer had, following an individualized assessment, determined that the applicant was not likely to become a public charge and that the applicant was otherwise eligible for a

visa. *Id.* The nationality-based immigrant visa suspension policy embodied in the Announcement and the Cable (the "Policy") thus has the effect of categorically banning the issuance of immigrant visas to nationals of nearly 40% of the world's countries.

Plaintiffs in this case—Catholic Legal Immigration Network, Inc. ("CLINIC"), African Communities Together ("ACT"), applicants for immigrant visas from designated countries, and United States citizens who are sponsoring family members from designated countries for immigrant visas—have brought this action seeking, *inter alia*, vacatur of the Policy and declaratory relief. ECF No. 12 ("Complaint" or "Compl.") at 86-103. Presently before the Court are the parties' cross-motions for partial summary judgment. ECF Nos. 47, 60.

The Court holds that the Policy is contrary to law and was issued in excess of Secretary Rubio's statutory authority. The Policy is therefore vacated under the Administrative Procedure Act ("APA").

## BACKGROUND

### A. Statutory and Regulatory Framework

The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, governs the admission of noncitizens into the United States and visa processing. Under the INA, a noncitizen seeking to enter the country must generally obtain a visa, which is a travel document issued by a U.S. consular officer. *See* 8 U.S.C. § 1201(a); *see also Sunny v. Biden*, 573 F. Supp. 3d 759, 764 (E.D.N.Y. 2021). A visa does not itself authorize entry into the United States; rather, it permits the holder to travel

to a port of entry and request permission to enter the United States. *See* 8 U.S.C. § 1201(h); *see also Trump v. Hawaii*, 585 U.S. 667, 694-97 (2018) (explaining the "basic distinction" between visa issuance and entry "that runs throughout the INA"); *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1157 (D.C. Cir. 1999) ("Obtaining a visa from an American consul has never guaranteed an alien's entry into the United States. A visa merely gives the alien permission to arrive at a port of entry and have an immigration officer independently examine the alien's eligibility for admission.").

Visas are generally divided into two overarching categories: (1) immigrant visas and (2) nonimmigrant visas. *See* 8 U.S.C. § 1101(a)(15); *see also Gomez v. Trump*, 485 F. Supp. 3d 145, 158 (D.D.C. 2020), *amended on other grounds by* 486 F. Supp. 3d 445 (D.D.C. 2020). "Immigrant visas are issued to foreign nationals intending to relocate permanently to the United States." *Gomez*, 485 F. Supp. 3d at 158. "Nonimmigrant visas are issued to foreign nationals seeking to enter the United States on a temporary basis for tourism, business, medical treatment, and certain types of temporary work." *Id.*

There are several different categories of immigrant visas that may be granted to applicants under different conditions and for different purposes. *Khamrabaeva v. Blinken*, No. 22-CV-01219 (RC), 2022 WL 4446387, at *1 (D.D.C. Sept. 24, 2022); *see* 9 FAM 502.1 (listing immigrant visa categories). Some immigrant visa categories are family-based, others are employment-based, and still others are available on different grounds. *See* U.S. Dep't of State, *Directory of Visa Categories*,

https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/all-visa-categories.html (last visited Aug. 17, 2026).

Regardless of the specific immigrant visa category, however, all immigrant visa applications must ultimately be adjudicated by a consular officer. "The INA confers upon consular officers exclusive authority to review applications for visas, precluding even the Secretary of State from controlling their determinations." *Saavedra Bruno*, 197 F.3d at 1156 (citing 8 U.S.C. §§ 1104(a), 1201(a)); *see* 8 U.S.C. § 1104(a) ("The Secretary of State shall be charged with the administration and the enforcement of . . . immigration and nationality laws relating to . . . the powers, duties, and functions of diplomatic and consular officers of the United States, *except those powers, duties, and functions conferred upon the consular officers relating to the granting or refusal of visas* . . . ." (emphasis added)). "The powers afforded to consular officers include, in particular, the granting, denying and revoking of immigrant . . . visas." *Saavedra Bruno*, 197 F.3d at 1156 (citation omitted); *see* 8 U.S.C. § 1201(a)(1) ("Under the conditions hereinafter prescribed and subject to the limitations prescribed in this chapter or regulations issued thereunder, a consular officer may issue . . . to an immigrant who has made proper application therefor, an immigrant visa . . . ."). "Consular officers exercise this authority subject to the eligibility requirements in the statute and corresponding regulations." *Saavedra Bruno*, 197 F.3d at 1157 (citing 22 C.F.R. §§ 41.121-.122).

As part of the adjudication process, "[a]n interview is usually scheduled with a consular officer abroad at the U.S. embassy or consulate with jurisdiction over the

applicant's place of residence." *Bibi v. Bitter*, No. 23-CV-07214 (LDH), 2024 WL 4350670, at *1 (E.D.N.Y. Sept. 30, 2024) (citing 22 C.F.R. §§ 42.61-.62). "At the interview, a consular officer reviews and adjudicates the visa application, determining whether to issue or refuse the visa." *Id.* (citing 8 U.S.C. § 1201(a)(1); 9 FAM 504.1-3(g)).

As relevant here, when a visa application has been properly completed in accordance with the INA, a consular officer must issue the visa or refuse the visa under 8 U.S.C. § 1201(a) or (g) or other applicable law. 22 C.F.R. § 42.81(a). The INA's implementing regulations prohibit a consular officer from refusing a visa other than "upon a ground specifically set out in the law or implementing regulations." *Id.* § 40.6. If refusing a visa, the consular officer is required to inform the applicant of the provision of law or regulation upon which the refusal is based. *Id.* § 42.81(b).

Section 221(g) of the INA, codified at 8 U.S.C. § 1201(g), governs when consular officers must refuse visas. That provision provides, with limited exceptions, that no visa shall be issued to a noncitizen if:

> (1) it appears to the consular officer, from statements in the application, or in the papers submitted therewith, that such alien is ineligible to receive a visa or such other documentation under section 1182 of this title, or any other provision of law,
>
> (2) the application fails to comply with the provisions of this chapter, or the regulations issued thereunder, or
>
> (3) the consular officer knows or has reason to believe that such alien is ineligible to receive a visa or such other documentation under section 1182 of this title, or any

other provision of law.

8 U.S.C. § 1201(g). Accordingly, "[a] consular officer refuses a visa application when the applicant fails to establish his or her eligibility to receive the visa" under Section 1182. *Bibi*, 2024 WL 4350670, at *1 (citing 8 U.S.C. § 1201(g)).

Section 1182, in turn, provides that noncitizens "are ineligible to receive visas and ineligible to be admitted to the United States" if they "are inadmissible" based on the grounds identified therein. 8 U.S.C. § 1182(a). Section 1182 sets out "ten grounds of inadmissibility." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 51 (2d Cir. 2020) (citing 8 U.S.C. § 1182(a)(1)-(10)).

One ground particularly relevant to the present action is Section 212(a)(4)(A) of the INA, codified at 8 U.S.C. § 1182(a)(4)(A). The so-called public charge provision renders inadmissible any noncitizen "who, in the opinion of the consular officer at the time of application for a visa, . . . is likely at any time to become a public charge." 8 U.S.C. § 1182(a)(4)(A). While the INA "does not define 'public charge,'" *U.S. Dep't of Homeland Sec.*, 969 F.3d at 51, the Second Circuit has construed the term to mean "a non-citizen who cannot support himself, in the sense that he is incapable of earning a livelihood, does not have sufficient funds in the United States for his support, and has no person in the United States willing and able to assure that he will not need public support," *id.* at 74-75 (cleaned up). In other words, "Congress intended the public charge ground of inadmissibility to apply to those non-citizens who were likely to be unable to support themselves in the future and to rely on the government for subsistence." *Id.* at 74.

Separately, the regulations implementing Section 1182(a)(4) define "[l]ikely at any time to become a public charge" as meaning "likely at any time to become primarily dependent on the government for subsistence, as demonstrated by either the receipt of public cash assistance for income maintenance or long-term institutionalization at government expense." 8 C.F.R. § 212.21(a).

Congress has further provided five factors that consular officers "must consider when determining whether a non-citizen is likely to become a public charge: the non-citizen's '(1) age; (2) health; (3) family status; (4) assets, resources, and financial status; and (5) education and skills.'" *U.S. Dep't of Homeland Sec.*, 969 F.3d at 53 (brackets omitted) (quoting 8 U.S.C. § 1182(a)(4)(B)(i)). Likewise, DOS's official guidance directs consular officers to "look at the totality of the applicant's circumstances at the time of visa application" when "considering the likelihood of an applicant becoming a 'public charge.'" 9 FAM 302.8-2(B)(2). In making that determination, "many factors are relevant, including age, health, family status, assets, resources, financial status, education, and skills." 9 FAM 302.8-2(B)(2), (3). Accordingly, "[n]o single factor, other than the lack of a qualifying affidavit of support, in accordance with INA 213A, if required, will determine whether an individual is a public charge." *Id.* 302.8-2(B)(3).

Moreover, the INA provides that "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." 8 U.S.C. § 1152.

### B. Factual Background

#### 1. The Announcement and the Cable

On January 14, 2026, DOS announced, "Effective January 21, 2026, the Department of State is pausing all visa issuances to immigrant visa applicants who are nationals of the following countries."[1] ECF No. 48-1. The Announcement explained:

> President Trump has made clear that immigrants must be financially self-sufficient and not be a financial burden to Americans. The Department of State is undergoing a full review of all policies, regulations, and guidance to ensure that immigrants from these high-risk countries do not utilize welfare in the United or become a public charge.

*Id.*

On January 14, 2026, Secretary Rubio transmitted a cable to all diplomatic and consular posts titled "Pausing Immigrant Visa Issuances for Nationalities at High Risk of Public Charge." Admin. Rec. at 2. The Cable contained a summary and action request stating, "Effective January 21, consular officers must refuse

---

[1] The 75 countries identified in the Announcement are Afghanistan, Albania, Algeria, Antigua and Barbuda, Armenia, Azerbaijan, Bahamas, Bangladesh, Barbados, Belarus, Belize, Bhutan, Bosnia and Herzegovina, Brazil, Burma, Cambodia, Cameroon, Cape Verde, Colombia, Cote d'Ivoire, Cuba, Democratic Republic of the Congo, Dominica, Egypt, Eritrea, Ethiopia, Fiji, The Gambia, Georgia, Ghana, Grenada, Guatemala, Guinea, Haiti, Iran, Iraq, Jamaica, Jordan, Kazakhstan, Kosovo, Kuwait, Kyrgyz Republic, Laos, Lebanon, Liberia, Libya, Moldova, Mongolia, Montenegro, Morocco, Nepal, Nicaragua, Nigeria, North Macedonia, Pakistan, Republic of the Congo, Russia, Rwanda, Saint Kitts and Nevis, Saint Lucia, Saint Vincent and the Grenadines, Senegal, Sierra Leone, Somalia, South Sudan, Sudan, Syria, Tanzania, Thailand, Togo, Tunisia, Uganda, Uruguay, Uzbekistan, and Yemen. ECF No. 48-1 at 2.

under Section 221(g) of the Immigration and Nationality Act to all immigrant visa applicants who have not been refused under another ground of ineligibility, if the applicant is a national of the following countries."[2] *Id.* The Cable clarified the action request as follows:

> The Department is undergoing a full review of all policies, regulations, and guidance to ensure the highest level of screening and vetting of every visa applicant. Applicants from these countries are at a high risk for becoming a public charge and recourse to local, state, and federal government resources in the United States. Consular officers should continue to conduct interviews and fully assess each applicant for all possible ineligibilities, including INA 212(a)(4), Public Charge.

*Id.* at 3.

The Cable further provided "Implementation Guidance" for consular officers:

> Immigrant Visa issuance to applications from these countries is paused until further notice. However, interview appointments for applicants from these nationalities should not be cancelled. Consular officers should continue to adjudicate all immigrant visa cases and carefully evaluate all potentially applicable grounds of ineligibility, including assessing whether an applicant is likely to become a public charge, in accordance with guidance in 9 FAM 302.8-2. If an officer believes an applicant is likely to become a public charge and ineligible under INA section 212(a)(4)(a), the officer should refuse the applicant under that ground and include detailed case notes explaining this finding. Officers should assess all other potential grounds of ineligibility first, and if an officer has not refused the applicant under any other ground, the officer should make detailed case notes explaining all aspects of the case (including the factors

---

[2] The countries identified in the Cable are the same countries listed in the Announcement, except the Kyrgyz Republic, Bosnia and Herzegovina, and North Macedonia are instead referred to as "Kyrgyzstan," "Bosnia," and "Macedonia," respectively. Admin. Rec. at 2.

> highlighted in Ref. B) where additional information could yield more data concerning the applicant's eligibility vis-à-vis 212(a)(4). Officers should then refuse the applicant 221(g) while the Department develops additional screening and vetting tools, polices, and operations to more accurately identify any IV applicant likely to become a public charge. . . . If an officer refuses an applicant under 4(a) and then the applicant provides additional evidence that demonstrates he or she overcomes the public charge refusal, the consular officer should write detailed case notes . . . and refuse the applicant 221(g).

*Id.* at 3-4 (emphasis omitted).

The Cable also instructs consulates to refuse immigrant visas to applicants who have already been approved, but whose actual printed visa has yet to leave the consulate. *Id.* Under those circumstances, the consular officer is instructed to reopen the case, refuse the application under Section 221(g), and inform the applicant that "additional administrative processing is necessary to determine their eligibility for a visa under U.S. law." *Id.* at 4.

The administrative record indicates that the 75 countries were selected in accordance with public assistance and welfare-use statistics from the Council of Economic Advisors, which calculated the percentage of immigrant households receiving some form of public assistance by country of origin. *Id.* at 6-16. For all nations where the percentage of households receiving assistance was greater than 30%—with the exception of certain countries for foreign policy reasons—the Policy prohibited applicants from receiving immigrant visas. *Id.*

No notice-and-comment procedures preceded either the Announcement or the Cable. ECF No. 48-15 ("Kassa Decl."), ¶ 19; ECF No. 53 ("Pls. 56.1 Stmt."), ¶ 21;

ECF No. 62 ("Gov't 56.1 Stmt."), ¶ 21.

**2. Plaintiffs**

The Complaint asserts claims on behalf of 11 individual Plaintiffs (the "Individual Plaintiffs"), CLINIC, and ACT. Compl., ¶¶ 10, 11, 16, 25-35.

CLINIC is a national nonprofit organization that provides training, resources, and support to a network of immigration legal service providers. ECF No. 48-14 ("Wheeler Decl."), ¶ 4. In that capacity, CLINIC supports approximately 3,000 employees at over 415 affiliate Catholic and community-based immigration law programs across 49 states. *Id.* Roughly 79% of CLINIC affiliates offer consular processing services. *Id.*, ¶ 6. In addition, 17 members of CLINIC's 81-person staff devote their time to substantive immigration law matters, including family-based immigration, as members of CLINIC's Training and Technical Assistance section. *Id.*, ¶ 7. Approximately 70% of CLINIC's Training and Technical Assistance Team budget is allocated to addressing substantive immigration law matters, including family-based immigration. *Id.*

ACT is a national membership-based nonprofit organization headquartered in Harlem, New York City, New York. Kassa Decl., ¶ 2. Its members comprise thousands of African immigrants and their families across multiple states and the District of Columbia. *Id.*, ¶¶ 4, 10. ACT's mission is to empower African immigrants to integrate socially, advance economically, and engage civically. *Id.*, ¶ 3. To accomplish this mission, ACT offers a variety of free services to its members, including immigration legal services that include assisting with

Case: 26-2573, 09/11/2026, DktEntry: 21.1, Page 12 of 61

adjustment of status applications, family-based petitions, affidavits of support, and consular processing; facilitating health insurance and public-school enrollment; supporting applications for identification documents; offering job recruitment and leadership development programs; providing referrals for food and housing; and other services. *Id.* Accordingly, reuniting families through family-based immigration and connecting them to needed forms of assistance is especially important for ACT's members and clients, many of whom are from or have family members from Algeria, Cameroon, Egypt, Ethiopia, Ghana, Liberia, Morocco, Nigeria, Democratic Republic of Congo, Rwanda, Tunisia, and Uganda. *Id.*, ¶¶ 3, 9-10.

Of the Individual Plaintiffs, six are United States citizens who filed family-based immigration petitions on behalf of their family members to come to the United States: Agnes Kyeremaa ("Kyeremaa"), Patricia Richardson ("Richardson"), Cesar Andred Aguirre ("Aguirre"), Maru Mahmud Hassen ("Maru Hassen"), Munthaz Mahmud Hassen ("Munthaz Hassen"), and Adrian Mitchell ("Mitchell"). Pls. 56.1 Stmt., ¶¶ 23-48; Gov't 56.1 Stmt., ¶¶ 23-48. The remaining five are "intending immigrants" who filed employment-based petitions on their own behalf to come to the United States: Juan David Buitrago Cagua ("Cagua"), Alejandra Alcendra Moscote ("Moscote"), Andres Alfonso Medina Ramirez ("Ramirez"), Fernando Lizcano Losada ("Losada"), and Lina Margarita Angulo Peñaranda ("Peñaranda"). Pls. 56.1 Stmt., ¶¶ 49-68; Gov't 56.1 Stmt., ¶¶ 49-68.

Case: 26-2573, 09/11/2026, DktEntry: 21.1, Page 13 of 61

As of March 11, 2026, three of the U.S.-citizen Plaintiffs[3] had family members whose consular interviews had not yet occurred, whereas the five intending-immigrant Plaintiffs,[4] as well as the family members of three other U.S.-citizen Plaintiffs,[5] had already had their consular interviews. Pls. 56.1 Stmt., ¶¶ 25, 29, 34, 38, 42, 47, 51, 55, 59, 63, 67; Gov't 56.1 Stmt., ¶¶ 25, 29, 34, 38, 42, 47, 51, 55, 59, 63, 67. For the applicants who had completed their interviews by that date, consular officers refused their visa applications under 8 U.S.C. § 1201(g). *See* Pls. 56.1 Stmt., ¶¶ 25, 34, 47, 51, 55, 59, 63, 67; Gov't 56.1 Stmt., ¶¶ 25, 34, 47, 51, 55, 59, 63, 67. Moreover, the family members of the U.S.-citizen Plaintiffs who had been interviewed were specifically informed that their visa applications were refused because they are nationals of Ghana, Guatemala, and Jamaica and therefore subject to the Policy. Pls. 56.1 Stmt., ¶¶ 24-25, 32, 34, 45, 47; Gov't 56.1 Stmt., ¶¶ 24-25, 32, 34, 45, 47. The notice of refusal that Ramirez received as an intending immigrant also cited the Policy. Pls. 56.1 Stmt., ¶ 59; Gov't 56.1 Stmt.,

[3] These Plaintiffs are Richardson, Maru Hassen, and Munthaz Hassen. Pls. 56.1 Stmt., ¶¶ 29, 38, 42; Gov't 56.1 Stmt., ¶¶ 29, 38, 42. The family members on whose behalf they petitioned are nationals of Jamaica, Ethiopia, and Ethiopia, respectively. Pls. 56.1 Stmt., ¶¶ 28, 37, 41; Gov't 56.1 Stmt., ¶¶ 28, 37, 41.

[4] These Plaintiffs are Cagua, Moscote, Ramirez, Losada, and Peñaranda. Pls. 56.1 Stmt., ¶¶ 51, 55, 59, 63, 67; Gov't 56.1 Stmt., ¶¶ 51, 55, 59, 63, 67. Cagua is a citizen of Colombia, ECF No. 48-22 ("Cagua Decl."), ¶ 3, and Moscote, Ramirez, Losada, and Peñaranda are nationals of Colombia, ECF No. 48-23 ("Moscote Decl."), ¶ 3; ECF No. 48-24 ("Losada Decl."), ¶ 3; ECF No. 48-25 ("Peñaranda Decl."), ¶ 3; ECF No. 76 ("Ramirez Decl."), ¶ 3.

[5] These Plaintiffs are Kyeremaa (who is an ACT member), Aguirre, and Mitchell. Pls. 56.1 Stmt., ¶¶ 23, 25, 34, 47; Gov't 56.1 Stmt., ¶¶ 23, 25, 34, 47. The family members on whose behalf they petitioned are nationals of Ghana, Guatemala, and Jamaica, respectively. Pls. 56.1 Stmt., ¶¶ 24, 32, 45; Gov't 56.1 Stmt., ¶¶ 24, 32, 45.

Case: 26-2573, 09/11/2026, DktEntry: 3.1, Page 14 of 61

¶ 59; Ramirez Decl., ¶ 9.

As of March 11, 2026, the five intending-immigrant Plaintiffs, as well as the family members on whose behalf the six U.S.-citizen Plaintiffs petitioned, remained outside the United States. Pls. 56.1 Stmt., ¶¶ 26, 30, 35, 39, 43, 48, 52, 56, 60, 64, 68; Gov't 56.1 Stmt., ¶¶ 26, 30, 35, 39, 43, 48, 52, 56, 60, 64, 68.

### C. Procedural Background

On February 2, 2026, Plaintiffs initiated this case, asserting nine causes of action. Compl., ¶¶ 224-92. Three of those causes of action—Counts One, Three, and Seven—are the subject of the instant cross-motions for partial summary judgment. Count One asserts that the Policy is, *inter alia*, contrary to law and in excess of statutory authority under 5 U.S.C. § 706(2)(A)-(C). Compl., ¶¶ 224-33. Count Three claims that the Government violated the APA, 5 U.S.C. § 553, by enacting a legislative rule without providing the requisite notice and opportunity for comment. Compl., ¶¶ 238-46. In Count Seven, Plaintiffs assert that the Policy violates the doctrine articulated in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), by purporting to override the express terms of the INA and its implementing regulations.[6] Compl., ¶¶ 263-73.

## LEGAL STANDARDS

A grant of summary judgment is proper when "there is no genuine dispute as

[6] Count Seven also asserts a claim regarding the rules promulgated by DOS in November 2025 that govern public charge determinations, Compl., ¶¶ 3, 265, but Plaintiffs clarify that their motion for summary judgment on Count Seven does not concern the November 2025 rules, ECF No. 49 ("Pls. Mem.") at 2 n.2.

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (citation omitted).

When determining whether a genuine and material factual dispute exists, the Court must view all "evidence in the light most favorable to the [non-moving party]." *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (citation omitted). Accordingly, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citation omitted).

Ultimately, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is also "appropriate '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Bruno v. City of Schenectady*, 727 F. App'x 717, 719 (2d Cir. 2018) (summary order) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

"However, when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal, and the entire case on review is a

question of law." *New York v. U.S. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 516 (S.D.N.Y. 2019) (cleaned up). Consequently, "the usual Rule 56 summary judgment standard does not apply in such cases, because the court is resolving legal questions when it determines if the agency acted in excess of statutory authorization, not in accordance with law, . . . or in some other way that violates 5 U.S.C. § 706." *Id.* (cleaned up); *see also Estes v. U.S. Dep't of the Treasury*, 219 F. Supp. 3d 17, 27 (D.D.C. 2016) ("When an agency action is challenged under the APA, summary judgment serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the relevant APA standard of review." (cleaned up)). "Summary judgment is generally appropriate in such cases, as these legal issues are amenable to summary disposition." *Id.* (cleaned up).

"Judicial review of agency action is generally 'confined to the full administrative record before the agency at the time the decision was made.'" *Authors Guild v. Nat'l Endowment for the Humans.*, No. 25-CV-03657 (CM), 2025 WL 3678097, at *4 (S.D.N.Y. Dec. 18, 2025) (quoting *Env't Def. Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981)). "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *see also Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

The Court may consider extra-record evidence to establish whether plaintiffs have standing, however. *See, e.g.*, *New York v. Scalia*, 490 F. Supp. 3d 748, 767 (S.D.N.Y. 2020).

**DISCUSSION**

In many ways, this is not a challenging case. Congress enacted comprehensive procedures related to the issuance or refusal of immigrant visas. At the center of the statutory scheme are the consular officers. Congress imbued these officers with exclusive authority and discretion to determine if an immigrant is eligible for a visa based upon review of specific and detailed criteria set forth in the statute. The Policy, which categorically prohibits the issuance of immigrant visas based upon the nationality of the applicant, represents a direct abrogation of this statutory scheme.

Consular officers are required to conduct an individualized assessment of applicants and to refuse visas only to those whom the consular officer finds ineligible. The Policy nonetheless directs consular officers to refuse eligible applicants.

The INA prohibits discrimination on the basis of nationality in the issuance of immigrant visas. The Policy categorically bans nationals of 75 countries from receiving immigrant visas, even when otherwise eligible, based solely on their nationality.

The INA explicitly strips the Secretary of State of authority over consular adjudication of immigrant visas. Through the Policy, Secretary Rubio nonetheless

overrides consular discretion and decision-making and dictates whether immigrant visas shall be granted or denied.

The Policy is thus patently unlawful and must be vacated under the APA.

### A. Threshold Issues

Before reaching the merits, the Court must first address threshold issues pertaining to jurisdiction. The Government contends that Plaintiffs' claims fail at the outset because (1) Plaintiffs lack standing, (2) the doctrine of consular nonreviewability bars judicial review of Plaintiffs' claims, and (3) APA review is unavailable because the Policy does not constitute final agency action. ECF No. 61 ("Gov't Opp'n") at 6-11, 24-30. These arguments are unavailing.

#### 1. Standing

Article III of the Constitution limits the federal judicial power to deciding "Cases" and "Controversies." U.S. Const. art. III, § 2. "'Under Article III, a case or controversy can exist only if a plaintiff has standing to sue,' meaning a personal stake in the outcome of the litigation." *Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 45 (2d Cir. 2023) (quoting *United States v. Texas*, 599 U.S. 670, 675 (2023)). To establish Article III standing, a plaintiff must show that it "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

To meet the first prong, Plaintiffs must point to an injury in fact that is "(a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or

Case: 26-2573, 09/11/2026, DktEntry: 31.1, Page 19 of 61

hypothetical." *Rajamin v. Deutsche Bank Nat'l Tr. Co.*, 757 F.3d 79, 85 (2d Cir. 2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "The second and third standing requirements—[traceability] and redressability—are often flip sides of the same coin." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). Regarding traceability, "the line of causation between the illegal conduct and injury . . . must not be too speculative or too attenuated." *Id.* at 383 (cleaned up). Relatedly, redressability is demonstrated "when the relief sought 'would serve to . . . eliminate any effects of' the alleged legal violation that produced the injury in fact." *Soule*, 90 F.4th at 47 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 105-06 (1998)).

**a. Individual Plaintiffs**

The Individual Plaintiffs have satisfied the prerequisites of the Article III standing inquiry. The Individual Plaintiffs suffer an actual, concrete, and particularized injury because the Policy forecloses any possibility that they or their family members will obtain a visa. For the U.S.-citizen Plaintiffs, the "real-world effect that the [Policy] has had in keeping them separated from certain relatives who seek to enter the country" is a quintessential injury in fact. *Hawaii*, 585 U.S. at 698. And as to the intending-immigrant Plaintiffs, the "lost opportunity" to receive an immigrant visa is a sufficient injury in fact as well. *Mantena v. Johnson*, 809 F.3d 721, 731 (2d Cir. 2015) (quoting *Patel v. U.S. Citizenship & Immigr. Servs.*, 732 F.3d 633, 638 (6th Cir. 2013); *see also Abboud v. INS.*, 140 F.3d 843, 847 (9th Cir. 1998).

These injuries are directly traceable to the Policy directing consular officers to refuse immigrant visa applicants of certain nationalities. Because of their nationalities, the U.S.-citizen Plaintiffs' family members who were interviewed by consular officers and the intending-immigrant Plaintiffs have been refused visas. *See* Pls. 56.1 Stmt., ¶¶ 24-25, 32, 34, 47, 58-59; Gov't 56.1 Stmt., ¶¶ 24-25, 32, 34, 45, 47, 58-59; *see* Moscote Decl., ¶¶ 3, 9; Losada Decl., ¶¶ 3, 7; Peñaranda Decl., ¶¶ 3, 8; Cagua Decl., ¶¶ 3, 9; Ramirez Decl., ¶¶ 3, 9. For the U.S.-citizen Plaintiffs' family members who have not yet been interviewed by consular officers, the Policy guarantees that they will be refused immigrant visas. As a result, while the Policy is in effect, the Individual Plaintiffs' opportunity to receive an immigrant visa is effectively foreclosed.

By the same token, should the Policy be vacated, the Individual Plaintiffs' opportunity to receive an immigrant visa would be restored because their applications could then be meaningfully considered on their merits. The family members of three of the U.S.-citizen Plaintiffs, for example, were informed that their visa applications were refused under Section 1201(g) because they are nationals of countries subject to the Policy. *See* Pls. 56.1 Stmt., ¶¶ 24-25, 32, 34, 45, 47; Gov't 56.1 Stmt., ¶¶ 24-25, 32, 34, 45, 47. The notice of refusal that Ramirez received as an intending immigrant also cited the Policy to justify refusal under Section 1201(g). Pls. 56.1 Stmt., ¶¶ 57, 59; Gov't 56.1 Stmt., ¶¶ 57, 59; Ramirez Decl., ¶¶ 3, 9. For these individuals, no other ground of ineligibility was identified. *See* Pls. 56.1 Stmt., ¶¶ 25, 34, 47, 59; Gov't 56.1 Stmt., ¶¶ 25, 34, 47, 59. It follows,

then, that vacating the Policy would redress the Individual Plaintiffs' injuries by removing the obstacle currently denying them the opportunity to be meaningfully considered for immigrant visas under the standards prescribed by law.

Moreover, the fact that vacatur of the Policy would not guarantee visa issuance does not render the Individual Plaintiffs' injuries incapable of redress. The redressability requirement is satisfied where judicial relief can restore the "opportunity to pursue an immigration benefit . . . , even when the government retains ultimate discretion to deny that benefit." *A.C.R. v. Noem*, 809 F. Supp. 3d 103, 115 (E.D.N.Y. 2025) (citation omitted); *see, e.g.*, *Mantena*, 809 F.3d at 731. The Individual Plaintiffs have thus adequately demonstrated their standing to pursue this action.

**b. ACT and CLINIC**

"An association may have standing to sue as the representative of its members, even in the absence of injury to itself." *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 117 (2d Cir. 2025) (cleaned up). To establish associational standing, "an association must show: (1) 'its members would otherwise have standing to sue in their own right'; (2) 'the interests it seeks to protect are germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Id.* at 118 (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

ACT has associational standing because one of the Individual Plaintiffs, Kyeremaa, is a member of ACT, ECF No. 48-16 ("Kyeremaa Decl."), ¶ 4, and has

standing to sue in her own right, as discussed *supra*. Further, challenging the Policy's nationality-based prohibition on the issuance of immigrant visas to ACT members and their families is germane to ACT's mission to empower African immigrants by helping their families unite and stabilize in the United States. Kassa Decl., ¶ 9. Finally, because ACT seeks declaratory relief and vacatur against a Department-wide policy, neither its claims nor its requested relief requires participation by its individual members.

At this point in the inquiry, the Court need not, and does not, consider whether CLINIC has standing. "It is well settled that where, as here, multiple parties seek the same relief, 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (quoting *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 53 (2006)).

**2. The Doctrine of Consular Nonreviewability**

The Supreme Court has described the doctrine of consular nonreviewability as the "rule" that "federal courts cannot review" "a consular officer's denial of a visa." *Dep't of State v. Muñoz*, 602 U.S. 899, 908 (2024). Consistent with this general principle, the Second Circuit has previously ruled that courts may not "review . . . the action of [consular officers] suspending or denying the issuance of immigration visas." *Wan Shih Hsieh v. Kiley*, 569 F.2d 1179, 1181 (2d Cir. 1978).

The "doctrine originates in the courts' recognition of Congress's plenary power to make rules for the admission and exclusion of non-citizens." *Chen v.*

*Rubio*, 158 F.4th 393, 395-96 (2d Cir. 2025) (internal quotation marks omitted) (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972)). "When Congress delegates exercises of that power to the Executive, and the Executive, pursuant to that delegation, denies admission to a non-citizen, that decision is final and conclusive." *Id.* at 396 (internal quotations marks omitted) (quoting *Muñoz*, 602 U.S. at 908). Accordingly, with respect to such decisions, "[t]he Judicial Branch has no role to play unless expressly authorized by law." *Muñoz*, 602 U.S. at 908 (cleaned up).

Neither the Supreme Court nor the Second Circuit has decided whether the doctrine of consular nonreviewability bars judicial review of APA challenges to executive policies governing consular decisions. The D.C. Circuit, however, has held that "the consular nonreviewability doctrine does not foreclose [certain] APA claim[s]." *Pietersen v. U.S. Dep't of State*, 138 F.4th 552, 560 (D.C. Cir. 2025). "To the contrary, it is well settled that when plaintiffs pursue forward-looking challenges to the lawfulness of regulations or policies governing consular decisions, courts may review them to assure that the executive departments abide by the legislatively mandated procedures." *Id.*

The D.C. Circuit's analysis is persuasive. Permitting judicial review of the Executive's alleged violations of legislatively mandated procedures, as authorized by the APA, does not run afoul of the separation-of-powers principles that animate the consular nonreviewability doctrine. Rather, judicial review in such circumstances serves to guard against "the danger of one branch's aggrandizing its

power at the expense of another branch." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 878 (1991).

Plaintiffs challenge the "final, Department-level policies and agency actions" governing immigrant visa adjudications generally—namely, the Announcement and the Cable—and "do not seek review of any consular officer's issuance or refusal of any particular visa." Compl., ¶ 24. Nowhere in the Complaint do Plaintiffs request review or reversal of specific visa refusals by consular officers. *See generally id.* Instead, Plaintiffs request declaratory relief and vacatur with respect to the Announcement and the Cable. *Id.* at 102-03; Pls. Mem. at 23-25. Accordingly, the doctrine of consular nonreviewability "has no application here because [Plaintiffs] do not challenge a particular determination in a particular case of matters which Congress has left to executive discretion." *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798, 801 (D.C. Cir. 1985); *see also De Moura Gomes v. Rubio*, No. 26-CV-01883 (APM), 2026 WL 2212503, at *8 (D.D.C. July 31, 2026) ("Plaintiffs do not challenge a discretionary determination but rather a policy that is preventing adjudication of the application. . . . The doctrine of consular nonreviewability therefore presents no barrier to review.").

The Government invokes *Pak v. Biden*, 91 F.4th 896 (7th Cir. 2024), and *Matushkina v. Nielsen*, 877 F.3d 289 (7th Cir. 2017), to argue that Plaintiffs' APA claims cannot be shielded from the doctrine of consular nonreviewability. Gov't Opp'n at 9-10. Specifically, the Government invokes these cases to cast Plaintiffs' claims as prohibited attempts to "repackage[e] their substantive complaints as

procedural objections where the alleged injury existed only because visas had been denied." *Id.* at 9 (cleaned up).

Both cases are readily distinguishable. The *Matushkina* plaintiffs challenged a Customs and Border Patrol officer's inadmissibility determination that later formed the basis for a consular officer's refusal of one plaintiff's visa application. 877 F.3d at 291-92, 295. In *Pak*, the plaintiffs challenged the legal framework for processing terrorism-related inadmissibility grounds ("TRIG") exemptions after consular officers refused four of the plaintiffs' visa applications based on TRIG inadmissibility without granting them the opportunity to establish TRIG exemptions. 91 F.4th at 898-900. In both cases, the Seventh Circuit affirmed dismissal under the doctrine of consular nonreviewability because resolving the plaintiffs' claims would have required evaluating the substantive bases for the visa refusals, which was unjustified where the plaintiffs had failed to overcome the presumption that the consular officers' decisions were facially legitimate. *See id.* at 901-03; *Matushkina*, 877 F.3d at 294-96.

Here, by contrast, resolving Plaintiffs' claims does not require evaluation of any specific officer's determination regarding a particular Plaintiff's inadmissibility or visa ineligibility. Plaintiffs' challenge is limited to the Policy itself. Accordingly, the doctrine of consular nonreviewability does not bar judicial review of Plaintiffs' claims. *See, e.g.*, *Tate v. Pompeo*, 513 F. Supp. 3d 132, 142 (D.D.C. 2021) ("[T]he doctrine does not apply—and thus judicial review is available—where plaintiffs challenge the State Department's policies rather than the individual determination

of a consular officer."). Indeed, the Policy's restriction *against* individual determinations by consular officers is precisely the issue at hand.

### 3. Final Agency Action

Plaintiffs can only proceed under the APA if their challenge is to "final agency action." 5 U.S.C. § 704; *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) ("When, as here, review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'" (quoting 5 U.S.C. § 704)); *Air Espana v. Brien*, 165 F.3d 148, 152 (2d Cir. 1999) ("The APA explicitly requires that an agency action be final before a claim is ripe for review.").[7] The word "action" in Section 704 is meant to "cover comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001).

In *Bennett v. Spear*, 520 U.S. 154 (1997), the Supreme Court "distilled from [its] precedents two conditions that generally must be satisfied for agency action to be 'final' under the APA." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). The action must (1) "mark the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature," and

[7] Although *Air Espana* deemed the final agency action requirement to be jurisdictional, 165 F.3d at 152, that holding has since been called into question, *see, e.g.*, *Sharkey v. Quarantillo*, 541 F.3d 75, 87 n.10 (2d Cir. 2008) (collecting cases). Whether the Court treats the issue as "a question of statutory standing" or a threshold jurisdictional requirement does not alter the outcome here. *See Metro. Transp. Auth. v. Duffy*, 784 F. Supp. 3d 624, 656 n.53 (S.D.N.Y. 2025) (cleaned up).

(2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (citation omitted).

"The Supreme Court has interpreted the finality element in a pragmatic way." *Sharkey*, 541 F.3d at 88 (quotation marks omitted) (quoting *Fed. Trade Comm'n v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980)). "[I]f an agency has issued a 'definitive statement of its position, determining the rights and obligations of the parties,' the agency's action is final notwithstanding 'the possibility of further proceedings in the agency' on related issues . . . ." *Id.* at 89 (brackets omitted) (quoting *Bell v. New Jersey*, 461 U.S. 773, 779-80 (1983)). Indeed, Section 704 of the APA dictates that "a ruling may be final whether or not it may be subject to appeal or reconsideration 'unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative.'" *Lunney v. United States*, 319 F.3d 550, 554 (2d Cir. 2003) (quoting 5 U.S.C § 704).

As to the first *Bennett* prong, the Policy is not "of a merely tentative or interlocutory nature." Although the Announcement represents that DOS is "undergoing a full review of . . . policies" and merely "pausing" all visa issuances to certain immigrant visa applicants, ECF No. 48-1, the Cable contains mandatory instructions, effective January 21, 2026, that "consular officers must refuse" all immigrant visa applications from certain applicants, Admin. Rec. at 2. Accordingly, the Policy currently "*compels* agency officials" to refuse visa applications. *Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999, 1007 (D.C. Cir. 2014). This directive remains in effect indefinitely, as the Cable states it shall continue

"until further notice." Admin. Rec. at 3. Further, "[t]he mere possibility that [DOS] might reconsider" the Policy as part of its review "does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012). The first *Bennett* prong is thus satisfied, as "a practical assessment of the [P]olicy demonstrates that it is not merely an interim step in the agency's decision[-]making process but a final one." *Ullah v. Lafave*, No. 25-CV-12804 (LTS), 2026 WL 1541774, at *8 (D. Mass. June 2, 2026) (cleaned up); *see also De Moura Gomes*, 2026 WL 2212503, at *5; *Sangster v. Rubio*, No. 25-CV-00447 (ART) (CSD), 2026 WL 222316, at *3 (D. Nev. Jan. 28, 2026).

With respect to the second *Bennett* prong, "legal consequences will flow" from the Policy and already have. As another district court has observed, the Policy "is currently in effect, and while it is in effect, the Department of State will not approve [virtually] any immigrant visas for nationals of seventy-five countries." *Sangster*, 2026 WL 222316, at *3. Indeed, at least four Individual Plaintiffs' immigrant visa applications, submitted for themselves or their family members, have been refused because of the Policy. *See* Pls. 56.1 Stmt., ¶¶ 25, 34, 47, 59; Gov't 56.1 Stmt., ¶¶ 25, 34, 47, 59; Ramirez Decl., ¶ 9. Consequently, the second prong is satisfied. *See De Moura Gomes*, 2026 WL 2212503, at *5; *Ullah*, 2026 WL 1541774, at *8-9; *Sangster*, 2026 WL 222316, at *3.

Nonetheless, the Government argues that, because the Policy "operates through later consular action in individual cases[,] . . . [t]he legal consequence[s] of which Plaintiffs complain . . . arise[] only when a consular officer records a refusal

Case: 26-2573, 09/11/2026, DktEntry: 31.1, Page 29 of 61

in a specific adjudication." Gov't Opp'n at 7. According to the Government, the Policy does not "produce legal consequences." *Id.*

The Court rejects this argument. The Policy's "implementation [being] distributed across consular officers does not mean that the policy itself is not a final agency action." *Ullah*, 2026 WL 1541774, at *9; *see also Nat'l Env't*, 752 F.3d at 1007 (D.C. Cir. 2014) (holding that agency's "firm guidance . . . compel[ling] agency officials to apply different permitting standards in different regions of the country" was final agency action (emphasis omitted)). Indeed, the Government might as well argue that dropping a rock onto a highway has no consequences because gravity—not the person who dropped the rock—is what sends it crashing into the cars below.

Since both *Bennett* prongs are satisfied, and the Government's argument to the contrary has been disposed of, the Policy constitutes final agency action subject to judicial review under the APA.

**B. Merits Issues**

This brings us to the merits. The Court concludes that Secretary Rubio's nationality-based immigrant visa ban was promulgated in violation of 8 U.S.C. § 1201(g), 8 U.S.C. § 1152(a)(1)(A), and 22 C.F.R. § 40.6. Additionally, the visa ban exceeded the Secretary of State's authority under 8 U.S.C. § 1104(a). Plaintiffs are entitled to summary judgment as to these claims. The Court grants summary judgment to the Government with respect to the remaining claim.

Case: 26-2573, 09/11/2026, DktEntry: 31.1, Page 32 of 61

### 1. Contrary to Law and in Excess of Statutory Authority

The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A), (C). "[W]here the agency does not 'act in accordance with the law governing' that particular action," an "agency action is contrary to law." *Metro. Transp. Auth. v. Duffy*, No. 25-CV-01413 (LJL), 2026 WL 588117, at *12 (S.D.N.Y. Mar. 3, 2026) (quoting *Sissel v. Wormuth*, 77 F.4th 941, 947 (D.C. Cir. 2023)). This standard applies to "*any* law, and not merely those laws that the agency itself is charged with administering." *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003). It also applies when an agency acts "contrary to existing valid regulations." *Accardi*, 347 U.S. at 268; *Fed. Defs. of N.Y. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020) (holding party can sue under APA to "bring an agency's conduct into [regulatory] conformity"); *see, e.g.*, *Afr. Cmtys. Together v. Lyons*, 799 F. Supp. 3d 362, 386 (S.D.N.Y. 2025), *modified on other grounds*, No. 25-CV-06366 (PKC), 2026 WL 1382944 (S.D.N.Y. May 18, 2026).

"[F]or agencies charged with administering congressional statutes[,] [b]oth their power to act and how they are to act is authoritatively prescribed by Congress[.]" *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). Accordingly, "[i]n reviewing the scope of an agency's authority to act, 'the question . . . is always whether the agency has gone beyond what Congress has permitted it to do.'" *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 108 (2d Cir. 2018) (quoting *Arlington*, 569 U.S. at 297-98).

Case: 26-2573, 09/11/2026, DktEntry: 31.1, Page 31 of 61

Plaintiffs argue that the Policy is contrary to law or in excess of the statutory authority provided in multiple provisions of the INA, specifically 8 U.S.C. §§ 1104(a), 1152(a)(1)(A), 1182(a)(4), and 1201(g). Pls. Mem. at 12-17. The Court disagrees that the Policy is inconsistent with Section 1182(a)(4), the public charge provision of the INA. The Policy's nationality-based visa ban does, however, run afoul of the INA's anti-discrimination provision, Section 1152(a)(1)(A). It also violates Section 1201(g) and its implementing regulation, 22 C.F.R. § 40.6, as it mandates the refusal of visas to eligible applicants without any basis in law. The Policy further exceeds the bounds of the statutory authority conferred upon the Secretary of State under Section 1104(a).

**a. Section 1182(a)(4)**

Plaintiffs argue that the Policy is "squarely contrary" to Section 1182(a)(4)'s public charge provision. Pls. Mem. at 13. Specifically, Plaintiffs contend that "the INA does not permit categorical denials of visa applications such as the Visa Ban on public-charge grounds" and instead "requires that a public-charge determination must rest upon a case-by-case, individualized assessment of the application in accordance with the definition of public charge under the statute." *Id.* at 12. Yet according to Plaintiffs, the Policy "mandates the categorical refusal of all visa applications from nationals of the targeted countries . . . on the ground that nationals of those countries are purportedly 'at High Risk of Public Charge.'" *Id.* at 13. Plaintiffs therefore conclude that the Policy "seeks to overturn [Section 1182(a)(4)'s] framework entirely." *Id.*

While the Court agrees that the Policy is contrary to law, as discussed *infra*, it is not because the Policy contravenes Section 1182(a)(4). The Policy neither directs consular officers to forgo the individualized assessment required by Section 1182(a)(4) nor instructs them to categorically refuse immigrant visas on public-charge grounds.

Although the Policy is styled as pausing all immigrant visa issuances to applicants of nationalities that are at "high risk" of becoming a public charge, it does not supplant the requirements of Section 1182(a)(4). *See* ECF No. 48-1; Admin. Rec. at 2-5. To begin with, the Announcement declares that DOS "will continue to schedule applicants for appointments" despite "pausing all visa issuances to immigrant visa applicants who are nationals of the following [75] countries." ECF No. 48-1. The Announcement thus does not order consular officers to cease individually assessing applicants' likelihood of becoming public charges or to categorically refuse immigrant visa applications on public-charge grounds. *See id.*

The Cable likewise lacks mandates inconsistent with the requirements of Section 1182(a)(4). The Cable directs consular officers to continue interview appointments with applicants from the identified countries and "to adjudicate all immigrant visa cases and carefully evaluate all potentially applicable grounds of ineligibility, including assessing whether an applicant is likely to become a public charge, in accordance with guidance in 9 FAM 302.8-2." Admin. Rec. at 3. The Cable further instructs that, "[i]f an officer believes an applicant is likely to become

Case: 26-2573, 09/11/2026, DktEntry: 31.1, Page 33 of 61

a public charge and ineligible under INA section 212(a)(4)(a), the officer should refuse the applicant under that ground." *Id.* But "if an officer has not refused the applicant under any other ground, the officer should make detailed case notes explaining all aspects of the case . . . where additional information could yield more data concerning the applicant's eligibility vis-à-vis 212(a)(4)" and "then refuse the applicant [under] 221(g) while [DOS] develops additional screening and vetting tools, polices, and operations to more accurately identify any [immigrant visa] applicant likely to become a public charge." *Id.* at 3-4. In addition, "[i]f an officer refuses an applicant under [the public charge provision] and then the applicant provides additional evidence that demonstrates he or she overcomes the public charge refusal, the consular officer should . . . refuse the applicant [under] 221(g)." *Id.* at 4.

The Policy directs consular officers to individually assess applicants to determine whether they are likely to become a public charge as required by Section 1182(a)(4). *See id.* at 3. If the consular officers fail to identify any potential "grounds of ineligibility," or if those applicants present sufficient evidence demonstrating that they are unlikely to become a public charge, the Cable does not require consular officers to refuse their visa applications on public-charge grounds. *See id.* at 3-4. Instead, the Policy directs consular officers to refuse these immigrant visa applications under INA § 221(g) alone. *Id.* at 4.

Because the Policy does not displace the public-charge framework set forth by Section 1182(a)(4), it is not contrary to that provision. *See Ullah*, 2026 WL

1541774, at *10 ("the Nationality-Based Pause cannot be fairly read as implementing the public-charge provision"). Nonetheless, the Policy does contravene other INA provisions, to which the Court now turns.

**b. Section 1152(a)(1)(A)**

Section 1152(a)(1)(A) provides that, with limited exceptions,[8] "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, *nationality*, place of birth, or place of residence." 8 U.S.C. § 1152(a)(1)(A) (emphasis added). In violation of this edict, the Policy requires consular officers to discriminatorily refuse visas solely on the basis of the applicant's nationality.

Section 1152(a)(1)(A)'s unambiguous text leaves no doubt that Congress intended to abolish nationality-based discrimination in the immigrant visa process. *See Trump v. Hawaii*, 585 U.S. 667, 695 (2018) (Section 1152(a)(1)(A) "prohibits discrimination in the allocation of immigrant visas based on nationality and other traits"). Indeed, the elimination of nationality-based discrimination was a central component of the reform of the INA enacted in 1965 (the "1965 Revisions").

Before Section 1152(a)(1) was enacted, the "United States had in place a nationality-based quota system, which restricted the entry of immigrants into the country based on the immigrant's nation of birth." *Dorcas Int'l Inst. of R.I. v. U.S. Citizenship & Immigr. Servs.*, No. 26-CV-00132 (JJM) (PAS), 2026 WL 1622708, at

---

[8] None of the exceptions apply here, *see* 8 U.S.C §§ 1101(a)(27), 1151(b)(2)(A)(i), 1152(a)(1)(2), 1153, nor does either party argue that the exceptions are relevant.

*46 (D.R.I. June 5, 2026). "[F]ollowing calls from President John F. Kennedy and President Lyndon B. Johnson, Congress 'comprehensively revised' the INA in 1965 . . . ." *Id.* (brackets omitted) (quoting *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 338-39 (4th Cir. 2018) (Wynn, J., concurring), *vacated on other grounds*, 585 U.S. 1028 (2018)). The 1965 Revisions "were drafted concurrently with the Civil Rights Act of 1964 and the Voting Rights Act of 1965 and enacted at the height of the civil rights movement with the express purpose of 'eliminat[ing] the national origins system as the basis for the selection of immigrants to the United States.'" *Int'l Refugee*, 883 F.3d at 339 (Wynn, J., concurring) (quoting H.R. Rep. No. 89-745, at 8 (1965)); *see also S. 1932 & Other Legislation Relating to the Immigration Quota System Before the S. Subcomm. on Immigration & Naturalization Vol. 3*, 88th Cong. 107 (1964) (statement of Sen. Hart) ("A law that says that one man is somewhat less than another simply because of accident of his place of birth is not tolerable in the year 1964. A formula based on equality and fair play must be enacted.").

"Congress explained that the 1965 Revisions abolished nationality-based discrimination in the immigration system to 'firmly express in our immigration policy the dedication which our nation has to the principles of equality, of human dignity, and of the individual worth of each man and woman.'" *Int'l Refugee*, 883 F.3d at 339 (Wynn, J., concurring) (quoting *S. 1932 & Other Legislation Relating to the Immigration Quota System Before the S. Subcomm. on Immigration & Naturalization Vol. 1*, 88th Cong. 4 (1964) (statement of Sen. Kennedy)). Upon signing Section 1152(a)(1) "into law at Liberty Island, New York, President Johnson

lauded the end of the nationality-based discrimination that previously defined the American system of immigration." *Id.* "As a result of the 1965 Revisions, immigrants would be permitted to come to America 'because of what they are, and *not because of the land from which they sprung*.'" *Id.* at 340 (quoting 1965 Pub. Papers 1037, 1039 (Oct. 3, 1965)).

The Policy's categorical ban on the issuance of immigrant visas to nationals of nearly 40% of the world's countries, *see* ECF No. 48-4 at 1, breaches the commitment of the United States to adjudicate visa applications based solely on an individualized assessment of the applicant's eligibility under the INA, a principle embodied in the INA generally and Section 1152(a)(1) specifically. The visa ban is thus contrary to law.

The Government defends the Policy on the grounds that the nationality bar was enacted within the INA "framework." Gov't Opp'n at 13. In other words, the Government argues that because consular officers must still complete "the ordinary consular adjudications under the framework that Congress enacted" before "the operative legal consequence . . . arises," a visa ban based on nationality does not offend Section 1152(a)(1). *Id.*

The Government's argument finds no anchor in the statutory text. Nothing in Section 1152(a)(1)'s unconditional and precatory language suggests that a nationality ban is permissible when effectuated by a consular officer rather than through some other mechanism. The language of Section 1152(a)(1) is not directed at particular governmental personnel or processes. Rather, it broadly guarantees

that "no person shall . . . be discriminated against in the issuance of an immigrant visa" based upon their nationality. The agent of such discrimination, or how this discrimination is effectuated, is of no moment.

The Government's invocation of *Trump v. Hawaii*, 585 U.S. 667 (2018), is equally unavailing. *See* Gov't Opp'n at 13. In *Trump v. Hawaii*, the Supreme Court held that a presidential proclamation restricting the *entry* of nationals from certain countries did not violate Section 1152(a)(1)(A) because it did not place limits on the issuance of visas. *Id.* at 694-97. The Supreme Court's holding rested upon the "distinction between admissibility—to which [Section] 1152(a)(1)(A) does not apply—and visa issuance—to which it does." *Hawaii*, 585 U.S. at 695. There is no question that the Policy at issue here regulates visa issuance.

The Government relies upon *Hawaii* as support for the uncontroversial proposition that Section 1152(a)(1)(A) does not "repeal inadmissibility grounds" set forth in Section 1182. Gov't Opp'n at 13. This Court agrees. But that statement is a non-sequitur. The Policy does not rely upon any of the inadmissibility provisions of Section 1182. Indeed, that is one of the fundamental problems with the Policy: it demands refusals of visas where a consular officer has already determined that no basis for a finding of inadmissibility under Section 1182 exists. And it does so by drawing pernicious distinctions based upon nationality. The nationality-based visa ban is therefore contrary to law.

### c. Section 1201(g) and Its Implementing Regulations

The Policy requires consular officers to refuse immigrant visa applications submitted by virtually all nationals of 75 designated countries under Section 1201(g), even if the consular officer has determined that the applicant is not ineligible to receive a visa under Section 1182(a) or any other provision of law. The Policy therefore not only usurps the discretion that the INA exclusively vests in consular officers to make determinations regarding the issuance of immigrant visas, but also requires consular officers to refuse visas in direct contravention of Section 1201(g) and 22 C.F.R. § 40.6. This blatant repudiation of the elaborate statutory scheme enacted by Congress cannot withstand even the most cursory scrutiny.

Under the INA, "[a]ll immigrant visa applications shall be reviewed and adjudicated by a consular officer." 8 U.S.C. § 1202(b). Consular officers are tasked with conducting individualized assessments "of prospective immigrants' medical status, criminal history, financial affairs, and other personal details" to determine whether any of INA's grounds of inadmissibility apply. *Sangster*, 2026 WL 222316, at *5; *see, e.g.*, 8 U.S.C. § 1182(a)(1)-(6). The consular officer's determination of inadmissibility is conclusive for purposes of whether an applicant is ineligible to receive a visa. *See* 8 U.S.C. § 1201(g).

Although consular officers possess the exclusive authority to adjudicate immigrant visa applications, that authority is constrained by the INA's visa eligibility requirements. Consular officers exercise a great deal of discretion in determining whether a ground for ineligibility exists under Section 1182(a). *See,*

*e.g.*, *id.* § 1361 ("If [a noncitizen] fails to establish to the *satisfaction* of the consular officer that he is eligible to receive a visa or other document required for entry, no visa or other document required for entry shall be issued to such person . . . ." (emphasis added)). Yet once the consular officer determines an applicant is ineligible, Section 1201(g) mandates refusal of the immigrant visa. *Id.* § 1201(g).

Moreover, and as pertinent here, a consular officer may not refuse a visa other than "upon a ground specifically set out in the law or implementing regulations." 22 C.F.R. § 40.6. Just as a consular officer must refuse a visa to an ineligible applicant under Section 1201(g), so too must a consular officer grant an immigrant visa if the officer has determined that an applicant is eligible for admission and no other provision of law "specifically" prohibits the issuance of the visa. *See* 8 U.S.C. § 1201(a), (g); 22 C.F.R. §§ 40.6, 42.81(a).

The Policy nonetheless directs consular officers to refuse certain immigrant visa applications under Section 1201(g) even where no grounds for refusal exist under the law. Under the Policy, "consular officers must refuse under Section [1201(g)] all immigrant visa applicants who have not been refused under another ground of ineligibility, if the applicant is a national of the following [75] countries." Admin. Rec. at 2 (emphasis omitted). The Policy further specifies that "if an officer has not refused the applicant under [the public charge provision or] any other ground, the officer should . . . refuse the applicant [under] 221(g)." *Id.* at 3-4. Yet Section 1201(g) authorizes refusal only where "it appears to the consular officer," or the consular officer "knows or has reason to believe" that the applicant "is ineligible

to receive a visa" or the application otherwise "fails to comply" with the INA and its implementing regulations. 8 U.S.C. § 1201(g). Whether the Policy is construed as mandating a finding of ineligibility, thus overriding the consular officer's contrary determination, or as requiring consular officers to refuse visas to eligible applicants where no grounds exist in the law, the Policy violates Section 1201(g) and 22 C.F.R. § 40.6. *See Ullah*, 2026 WL 1541774, at *10 ("This mandatory refusal, despite a consular officer's determination that no grounds for ineligibility apply, appears contrary to law.").

Notably, the Government has not identified any provision of law that permits a consular officer to refuse a visa to an otherwise eligible applicant. Instead, the Government engages in what is best described as an exercise in Orwellian logic. It contends that, because the refusal is nominally issued under an "existing" INA authority, Section 1201(g), it is based on a "ground specifically set out in law" in conformance with 22 C.F.R. § 40.6. Gov't Opp'n at 22.

As discussed *supra*, Section 1201(g) does not provide authority to refuse a visa to an eligible applicant whose application complies with the INA and governing regulations, and certainly does not "specifically set out" a basis for the categorical denial of applicants based upon their nationality. *See, e.g.*, *Gomez*, 485 F. Supp. 3d at 191 ("Subsection 1201(g) precludes the issuance of visas only as to persons who are ineligible to receive a visa under Section 1182 . . . ." (cleaned up)). Once an applicant has filed a complete application, Section 1201(g) only authorizes the denial of visas to those applicants who fall within the ten listed categories of

Case: 26-2573, 09/11/2026, DktEntry: 21.1, Page 42 of 61

applicants ineligible to receive visas set forth in Section 1182(a). *Gomez*, 485 F. Supp. 3d at 192 ("Subsection 1182(a) does not provide the President or the State Department any authority to supplement the listed categories of dual ineligibility and inadmissibility."). The Government does not contend otherwise, nor could it, given the provision's unambiguous text. Accordingly, since the Policy effectively only operates to bar the issuance of visas to eligible applicants, its reliance upon Section 1201(g) is unavailing.

As to the Policy's abrogation of the consular officer's congressionally delegated role in the visa adjudication process, the Government's argument is perhaps even more disingenuous. The Government maintains that the Policy "preserve[s] the consular officer's role in the issuance-or-refusal decision" because "any non-issuance is still reflected through an officer-entered refusal in the individual case." Gov't Opp'n at 15-16. The fact that the mandatory visa refusal is ultimately effectuated by the consular officer hardly means that the consular officer's role in the statutory scheme has not been usurped. Although "[c]onsular officers may apply the ordinary mechanisms of adjudication [under the Policy], . . . they are permitted to reach only one result: refusal." *Ullah*, 2026 WL 1541774, at *10; *see also Sangster*, 2026 WL 222316, at *5. Removing the consular officers' ability to issue visas to broad swaths of eligible applicants in no meaningful way "preserves" their authority with respect to visa issuance.

While the Policy permits consular officers to exercise their normal functions up to a point, whatever determinations they make as to eligibility for the applicants

subject to the Policy are ultimately irrelevant. The outcome is predetermined. The visa will be refused. The Policy thus displaces consular officers from the role Congress assigned them in the visa issuance process, to make the final determination as to whether to refuse or grant immigrant visas to applicants in accordance with the INA and its implementing regulations.[9]

**d. Section 1104(a)**

In addition to its other defects, the Policy also exceeds the statutory authority that the INA vests in the Secretary of State. Specifically, Secretary Rubio's Cable directing consular officers that they "must refuse" immigrant visas to nationals of certain countries cannot be reconciled with Congress's express limitation on his authority as Secretary of State under Section 1104(a). *See* Admin. Rec. at 2.

Section 1104(a) delineates the Secretary of State's role in administering the immigration laws through DOS's diplomatic and consular functions. The statute provides:

> The Secretary of State shall be charged with the administration and the enforcement of the provisions of

[9] Plaintiffs also argue that the Policy "grossly departs" from 22 C.F.R. § 42.81(a). Pls. Mem. at 21. The Court disagrees that the Policy contravenes Section 42.81. That regulation provides, as relevant here, that when "a visa application has been properly completed and executed before a consular officer in accordance with the provisions of the INA and the implementing regulations, the consular officer must issue the visa, refuse the visa under INA 212(a) or 221(g) or other applicable law or, . . . discontinue granting the visa." 22 C.F.R. § 42.81(a). In other words, when a consular officer receives a completed application, he or she must take one of three actions. Consistent with the regulation, the Policy directs consular officers to take one of the three specified actions: refusal. Plaintiffs argue that Section 42.81 substantively requires that a visa be issued unless it may be refused under the INA. Pls. Mem. at 21. This regulation, standing alone, is largely procedural in nature and confers no substantive entitlement to issuance of a visa.

Case: 26-2573, 09/11/2026, DktEntry: 21.1, Page 43 of 61

> this chapter and all other immigration and nationality laws relating to (1) the powers, duties, and functions of diplomatic and consular officers of the United States, *except those powers, duties, and functions conferred upon the consular officers relating to the granting or refusal of visas*.

8 U.S.C. § 1104(a) (emphasis added). Accordingly, the INA unambiguously "preclude[es] . . . the Secretary of State from controlling [consular officers'] determinations" relating to the granting or refusal of visas. *Baan Rao Thai Rest. v. Pompeo*, 985 F.3d 1020, 1024 (D.C. Cir. 2021); *see also Shen v. U.S. Consulate Gen. at Shanghai*, 866 F. Supp. 779, 780 (S.D.N.Y. 1994) ("Congress specifically exempted the exercise of . . . powers . . . relating to the granting or refusal of visas . . . from review by the Secretary of State, and it has been consistently held that the consular official's decision to issue or withhold a visa is not subject . . . to administrative . . . review." (cleaned up) (collecting cases)).

Secretary Rubio's directive to consular officers in the Cable undeniably flouts Section 1104(a)'s limitation on his authority. The Cable commands consular officers to "refuse under Section 221(g) of the [INA] all immigrant visa applicants who have not been refused under another ground of ineligibility, if the applicant is a national of the following [75] countries." Admin. Rec. at 2 (emphasis omitted). Secretary Rubio's order thus predetermines the outcome of immigrant visa applications submitted by virtually all nationals of the 75 designated countries. Yet Congress expressly prohibits the Secretary of State from "administ[ering]" and "enforc[ing]" the "powers, duties, and functions conferred upon the consular officers relating to the granting or refusal of visas." 8 U.S.C. § 1104(a). In other words, despite

Case: 26-2573, 09/11/2026, DktEntry: 21.1, Page 44 of 61

Secretary Rubio's "lack[ of] authority to control which visa applications consular officers grant or deny," *Janay v. Blinken*, 743 F. Supp. 3d 96, 106 (D.D.C. 2024), he nonetheless asserts control over consular officers' decisions for an incredibly broad class of immigrant visa applications. The Policy exceeds the statutory authority that the INA vests in the Secretary of State.

**2. Notice and Comment**

Plaintiffs further claim that the Policy should be set aside because it was adopted without providing notice and an opportunity for comment. *See* Pls. Mem. at 17-20. The APA requires that "before promulgating a rule an agency must publish '[g]eneral notice of proposed rule making . . . in the Federal Register,' as well as 'an opportunity to participate in the rule making through submission of written data, views, or arguments.'" *Nat. Res. Def. Council*, 894 F.3d at 113 (quoting 5 U.S.C. § 553(b), (c)). The APA defines a "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4).

Rules that "must comply with the notice and comment provisions of the APA" are referred to as "legislative rules." *Sweet v. Sheahan*, 235 F.3d 80, 90 (2d Cir. 2000). In contrast, unless required by statute, the APA's notice-and-comment requirement does not apply to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). These exceptions are sometimes referred to collectively as "non-legislative rules." *E.g.*,

Case: 26-2573, 09/11/2026, DktEntry: 21.1, Page 45 of 61

*Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 424 (E.D.N.Y. 2018), *vacated on other grounds and remanded sub nom.*, *U.S. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020).

"The line between legislative rules (which are subject to notice and comment) and non-legislative rules (which are not) is not always clear." *Id.*; *see also Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir. 1975) (characterizing the distinction as "enshrouded in considerable smog"). Nonetheless, several guiding principles help clarify the distinction. In the Second Circuit, for example, "legislative rules are those that create new law, rights, or duties, in what amounts to a legislative act." *Sweet*, 235 F.3d at 91 (cleaned up). That is, a rule is legislative if an agency has exercised its "delegated power to make law through rules." *White v. Shalala*, 7 F.3d 296, 303 (2d Cir. 1993).

"General statements of policy," on the other hand, are "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979); *see also Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) ("An agency action that merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule—is a general statement of policy.").

So, does the Policy prescribe new "law" within the meaning of the APA? The D.C. Circuit articulated the seminal test for identifying legislative rules in

*American Mining Congress v. Mine Safety & Health Administration*, 995 F.2d 1106 (D.C. Cir. 1993), a case cited approvingly by the Second Circuit in *Sweet*, 235 F.3d at 91. The *American Mining* test lays out four factors indicative of a rule that creates law:

> (1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties;
>
> (2) whether the agency has published the rule in the Code of Federal Regulations;
>
> (3) whether the agency has explicitly invoked its general legislative authority; or
>
> (4) whether the rule effectively amends a prior legislative rule.

*Am. Mining*, 995 F.2d at 1112.

The *American Mining* factors focus on whether the rule creates legally enforceable rights or obligations in what is essentially a legislative act. *See Sweet*, 235 F.3d at 91 (describing legislative rules as those that "impose obligations on members of the public distinct from, and in addition to, those imposed by statute"). The Policy cannot be said to create new rights, and the only duties it imposes are on consular officers. Internal rules dictating agency procedures or practices are exempt from notice and comment. *See, e.g.*, *Batalla Vidal*, 291 F. Supp. 3d at 272 (holding that memorandum rescinding DACA was not subject to notice-and-comment requirements because, *inter alia*, the memorandum was "directed primarily at [agency] staff . . . describing how it will conduct agency discretionary

functions" (quoting *Noel*, 508 F.2d at 1030)).

The Policy creates no binding obligations on visa applicants that could be enforced through an administrative, civil, or criminal proceeding. *See Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1143 (6th Cir. 2022) (where a "failure to comply comes with the risk of penalties and criminal sanctions," this is a "characteristic[] of legislative rules"). Nor does the Policy purport to confer benefits on any class of individuals. DOS also did not purport to issue the Policy under its delegated authority from Congress to fill in gaps in the existing statutory framework through regulations that would have the force of law. To the contrary, as the Court has held, the Policy was issued in contravention of the INA and in excess of Secretary Rubio's statutory authority. The Policy thus does not qualify as a legislative rule.

The Court acknowledges that at least one court has held that the Policy is a legislative rule under the first prong of the *American Mining* test. *See Sangster*, 2026 WL 222316, at *7. Respectfully, the Court disagrees with the reasoning in *Sangster*. The *Sangster* court concluded that "in the absence of the rule there would not be an adequate legislative basis for enforcement action" because "a consular officer would not have sufficient reason to refuse every single application from the affected countries, especially not on the basis of their nationality alone." *Id.* But the consular officer's refusal of a visa application cannot fairly be characterized as an enforcement action penalizing the applicant for violating its provisions.

Immigrant visas are not refused because of any action taken by the applicant in abrogation of a legal duty imposed by the Policy.

*Sangster* cited the Ninth Circuit's decision in *Hemp Industries Association v. Drug Enforcement Administration*, 333 F.3d 1082 (9th Cir. 2003), in support of its holding. Yet *Hemp Industries* reinforces that the Policy does not qualify as a legislative rule. At issue before the Ninth Circuit was a policy issued by the Drug Enforcement Administration ("DEA") "purporting to interpret [certain] regulations to ban all naturally-occurring [tetrahydrocannabinols ("THC")], including that found in hemp seed and oil, on Schedule I." *Hemp Industries*, 333 F.3d at 1085. The Ninth Circuit determined this rule to be legislative because "enforcement actions by the DEA" could have a "binding effect . . . on tribunals *outside* the agency," as those who manufacture, distribute, or sell "hemp seed and oil products" that "contain some trace THC" could "face criminal penalties for violating the DEA's restrictions on Schedule I substances." *Id.* at 1086-88. The Policy has no analogous impact.

Similarly, in announcing its test, *American Mining* cited as an illustrative example the Securities and Exchange Commission ("SEC") regulations promulgated under Section 14 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n, which can subject individuals to civil penalties. 995 F.2d at 1109. The D.C. Circuit noted that Section 14(b) of the Exchange Act "forbids certain persons, 'to give, or to refrain from giving a proxy' 'in contravention of such rules and regulations as the Commission may prescribe.'" *Id.* (quoting 15 U.S.C.

§ 78n(b)). Accordingly, "[t]he statute itself forbids nothing except acts or omissions to be spelled out by the Commission in 'rules or regulations.'" *Id.* Such rules and regulations must therefore qualify as legislative because "in the[ir] absence," "the legislative basis for agency enforcement would be inadequate." *Id.*

As is clear from these examples, the focus of the *American Mining* test is on identifying rules from which legal obligations or benefits flow. The Policy does not qualify as such a rule. Plaintiffs contend that the Policy "purports to modify or suspend operation" of two existing regulations, 22 C.F.R. §§ 40.6 and 42.81, and thus is subject to notice and comment. Pls. Mem. at 19-20. An agency may not amend a previously promulgated legislative rule without notice and comment. *See NRDC v. National Highway Traffic Safety Admin.*, 894 F.3d 95, 113 (2d Cir. 2018); *see also* 5 U.S.C. § 551(5) (defining "rule making" as the process for "formulating, amending, or repealing a rule"). In contrast, amendment of a prior interpretive rule does not require notice and comment. *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 103 (2015). The Court need not reach the question of whether 22 C.F.R. §§ 40.6 and 42.81 are legislative or interpretive rules. The Court has previously determined that the Policy is not inconsistent with, and thus does not amend, Section 42.81. *See supra* note 11. The Court now holds that the Policy also does not amend Section 40.6.

The term "amend" has a precise meaning in legal usage, referring to the act of "chang[ing] the wording of" or "formally alter[ing] by striking out, inserting, or substituting words." *Perez*, 575 U.S. at 103 (quoting Black's Law Dictionary 98

Case: 26-2573, 09/11/2026, DktEntry: 31.1, Page 52 of 61

(10th ed. 2014)). An agency action does not necessarily "amend" a regulation, such that notice and comment is required, where the agency purports to interpret or implement the regulation, even if the agency action is contrary to the terms of the regulation. *Id.* at 103-04. A rule can result in "effective amendment," however, if it makes "major substantive legal changes" to the prior legislative rule. *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 35 (D.C. Cir. 2005).

Section 40.6 is a provision that sets forth the basis for refusal of visas generally. It defines statutory terms, establishes the burden of proof necessary for an applicant to establish eligibility for a visa, and sets forth the standards for the consular officer's consideration of evidence. 22 C.F.R. § 40.6. The Policy does not purport to overhaul these provisions.

As previously explained, the Policy does contravene the regulation's command that a "visa can be refused only upon a ground specifically set out in the law or implementing regulations." *Id.* Yet the Policy does not purport to alter this standard or set forth a new standard that governs the refusal of visas by consular officers generally. According to Plaintiffs' argument, any time an agency takes an action that a Court ultimately determines is contrary to a regulation, it has therefore "amended" that regulation such that its action was also subject to the APA's notice-and-comment requirements. That reasoning conflates the substantive and procedural provisions of the APA.

The Court concludes the Policy does not qualify as a legislative rule subject to the APA's notice-and-comment requirement.

### 3. The *Accardi* Doctrine

Finally, Plaintiffs argue that the Policy violates the *Accardi* doctrine because it "departs from [DOS's] existing regulations and procedures by requiring consular officers to refuse visa applications without a case-by-case assessment and without any determination that the applicant is ineligible under any provision of the Act." Pls. Mem. at 21. Specifically, Plaintiffs maintain that the Policy contravenes the INA, its implementing regulations, and multiple provisions of the Foreign Affairs Manual (the "FAM"). *Id.* at 21.

Under the *Accardi* doctrine, government agencies are required to follow their own "existing valid regulations." *Accardi*, 347 U.S. at 268. The doctrine "is not limited to rules attaining the status of formal regulations." *Montilla v. INS*, 926 F.2d 162, 167 (2d Cir. 1991). It also encompasses an agency's "internal procedures" "'where the rights of individuals are affected, . . . even where [those] procedures are possibly more rigorous than otherwise would be required,' and even though the procedural requirement has not yet been published in the federal register." *Id.* (quoting *Morton v. Ruiz*, 415 U.S. 199, 234 (1974)). Accordingly, when agencies fail to follow their own regulations and certain procedures, "the APA (as developed by case law) gives aggrieved parties a cause of action to enforce compliance." *Fed. Defs.*, 954 F.3d at 130 (2d Cir. 2020) (citing *Webster v. Doe*, 486 U.S. 592, 602 n.7 (1988)). As the Second Circuit has explained, "such a cause of action under the APA stands independent of any other right to sue agencies for violations of a statute. It exists to bring an agency's conduct into conformity with existing valid regulations . .

. ." *Id.* (cleaned up). Nonetheless, the *Accardi* doctrine does not apply where "the agency regulation that was departed from governed internal agency procedures rather than . . . the rights or interests of the objecting party." *Montilla*, 926 F.2d at 167 (collecting cases).

Plaintiffs' arguments with respect to the *Accardi* doctrine largely duplicate their contrary-to-law claims. Thus, the Court determines that the Policy violates the *Accardi* doctrine for the same reason that the Court determined the Policy was contrary to 22 C.F.R. § 40.6.

Because the Court's disposition of Plaintiffs' claims resting on statutory and regulatory violations is sufficient to grant Plaintiffs relief, the Court need not, and does not, reach whether the Policy also violates the FAM and other internal DOS regulations and procedures. *See, e.g.*, *PDK Lab'ys Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring) ("This is a sufficient ground for deciding this case, and the cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more—counsels us to go no further.").

**C. Remedy**

Plaintiffs seek vacatur of the Policy and all related and implementing actions, as well as declaratory relief that the Policy is unlawful under the APA. *See* Pls. Mem. at 2, 25; ECF No. 64 ("Pls. Reply") at 33. The Government contends that remand for further consideration by the agency is an adequate remedy for any defect under the APA. Gov't Opp'n at 27-30.

The Court concludes that vacatur of the Policy and declaratory relief are

appropriate here.

**1. Vacatur**

"In the usual case, when an agency violates its obligations under the APA, [the proper remedy is to] vacate a judgment and remand to the agency to conduct further proceedings." *Guertin v. United States*, 743 F.3d 382, 388 (2d Cir. 2014). Indeed, the APA explicitly directs that courts "shall" "set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A), (C). Vacatur is thus the default remedy when an agency action has been found to be unlawful under the APA. *See, e.g.*, *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) ("[V]acatur is the normal remedy.").

The Second Circuit has recognized that "[t]his rule . . . is not absolute." *Guertin*, 743 F.3d at 388. But it "has not articulated a test for deciding" when to "decline to vacate an agency action," *City Club of N.Y. v. U.S. Army Corps of Eng'rs*, 246 F. Supp. 3d 860, 872 (S.D.N.Y. 2017). As a result, "courts in this circuit apply a two-part test borrowed from the D.C. Circuit" to determine whether to deviate from the default remedy of vacatur. *N.Y. Legal Assistance Grp. v. Cardona*, No. 20-CV-01414 (LGS), 2025 WL 871371, at *2 (S.D.N.Y. Mar. 20, 2025) (collecting cases), *vacated on other grounds, appeal dismissed sub nom.*, *N.Y. Legal Assistance Grp. v. McMahon*, No. 21-888-CV, 2026 WL 1408439 (2d Cir. May 20, 2026). Under that test, courts consider (1) "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)" and (2) "the disruptive consequences of" vacatur. *Id.* (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul.*

*Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)). "In most cases, the first factor asks whether the agency could correct the deficiencies identified and reach the same ultimate decision." *City of Port Isabel v. FERC*, 130 F.4th 1034, 1036-37 (D.C. Cir. 2025) (cleaned up).

As to the first factor, the Policy's deficiencies cannot be cured without vacatur. The very basis of the Policy contravenes multiple provisions of the INA in a manner that goes far beyond correctable procedural deficiencies. The core of the Policy, the ban on issuance of visas to nationals of specified countries who were purportedly at high risk of becoming public charges, violates the INA's antidiscrimination provision. The manner in which the Policy was operationalized, by mandating that consular officers refuse visas to eligible applicants under Section 1201(g), despite that provision only authorizing refusal to ineligible applicants, was contrary to law. And the promulgation of the Policy exceeds the agency's statutory authority, as Congress has expressly divested the Secretary of State of authority to dictate to consular officers the outcomes of visa adjudications. As these defects are comprehensive, fundamental, and severe, vacatur is the only appropriate remedy. *See, e.g.*, *Nat. Res. Def. Council, Inc. v. U.S. Dep't of the Interior*, 478 F. Supp. 3d 469, 488 (S.D.N.Y. 2020) ("Vacatur, in particular, has long been held to be the appropriate remedy when an agency acts contrary to law" (cleaned up)); *New York v. U.S. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 577 (S.D.N.Y. 2019) (vacating rule where the APA violations were "numerous, fundamental, and far-reaching").

With respect to the second factor, the Government presents no indication that vacating the Policy will substantially disrupt the visa issuance process or other DOS efforts. *See* Gov't Opp'n at 27-30. To the contrary, vacatur here would merely undo a recent and unlawful "departure from [DOS's] prior longstanding position and enforcement practices" and restore the status quo. *Nat. Res. Def. Council*, 478 F. Supp. 3d at 489.

One additional point regarding the scope of vacatur warrants discussion. The Government cites the Supreme Court's recent decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), for its holding regarding universal injunctions. Gov't Opp'n at 30-31. In *CASA*, the Supreme Court held that universal injunctions were not authorized under the Judiciary Act of 1789. 606 U.S. at 841-47. Of particular relevance here, however, the Supreme Court clarified its holding did not bear on vacatur of agency action under the APA. *Id.* at 847 n.10. As Plaintiffs are not seeking injunctive relief, only vacatur of the Policy under the APA, Pls. Reply at 32-33, *CASA* is inapposite. *See Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *36 (D.C. Cir. Nov. 22, 2025) (per curiam) ("[T]he Department's procrustean effort to stretch *CASA*'s plaintiff-specific remedial framework onto the APA defies 'countless' precedents to the contrary.'" (quoting *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 830 (2024) (Kavanaugh, *J.*, concurring)).

To the extent the Government suggests that any relief granted in this case should be limited to the plaintiffs before the Court, it has long been understood that

the remedy of vacatur serves to nullify an unlawful agency action, rule, or policy in its entirety. Accordingly, "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harman v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989). Numerous decisions—including by the D.C. Circuit, the Second Circuit, and the Supreme Court—have recognized that the APA mandates vacatur of unlawful agency actions "rather than merely providing injunctive relief . . . enjoin[ing] enforcement of the rules against the specific plaintiffs." *Corner Post*, 603 U.S. at 831 (Kavanaugh, *J.*, concurring) (collecting cases); *see also Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("In some [APA] cases the [challenged] 'agency action' will consist of a rule of broad applicability; and if the plaintiff prevails, the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual. [A] single plaintiff, so long as he is injured by the rule, may obtain 'programmatic' relief that affects the rights of parties not before the court.").[10]

Accordingly, the Court sets aside and vacates the Policy. The Court also sets aside any refusal of an immigrant visa that was based solely upon the Policy suspending the issuance of immigrant visas to applicants from the 75 designated

[10] Admittedly, several Justices of the Supreme Court have recently called into question this traditional reading of the APA and whether it permits vacatur as a remedy. *See, e.g.*, *Texas*, 599 U.S. at 693-702 (Gorsuch, *J.*, concurring). Because the Government does not argue in this case that vacatur is unavailable as a matter of law in an APA action, the Court need not reach this question.

countries. For the avoidance of doubt, this vacatur does not extend to denial of immigrant visas on any ground other than the Policy. Accordingly, the Court does not vacate consular decisions to refuse a visa under Section 1201(g) where the consular officer found the applicant otherwise ineligible under Section 1182(a) or another provision of law, even if the consular officer decision or notification of the visa refusal also cited the Policy.

**2. Remand**

The Court declines to order remand to the agency for further proceedings with respect to the Policy itself. This case presents the "rare" situation where remand would serve no valid purpose. *Guertin*, 743 F.3d at 388; *see also Fla. Power & Light*, 470 U.S. at 744 (noting that there are "rare circumstances" where "remand to the agency for additional investigation or explanation" is not required). "[T]he outcome is clear from the 'compelling evidence in the record' that there is no further action to be taken following this Court's decision." *Duffy*, 2026 WL 588117, at *65 (quoting *Guertin*, 743 F.3d at 388). The Policy is irreconcilable with the INA's antidiscrimination provision and Section 1201(g), and it exceeds Congress's express limitation on the Secretary of State's authority. Since these are "error[s] of law," "[t]here is no evidence of an agency deliberation" or factual development that remand could possibly cure. *Id.* For example, "[n]o amount of further agency deliberation is necessary to decide [the Secretary of State's] authority." *Id.*; *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024) ("And when a particular statute delegates authority to an agency consistent with constitutional limits,

courts must . . . ensur[e] that the agency acts within it.”). Since such “question[s] belong[] to the courts,” and the Court has resolved them, remand is unnecessary. *Duffy*, 2026 WL 588117, at *65.

In contrast, remand is appropriate with respect to the vacated determinations to refuse immigrant visas in reliance upon the Policy. Consular officers are vested with the exclusive authority to determine whether those visa applications should be granted or refused. In remanding these applications for adjudication by the consular officers, the Court does not direct any particular outcome or process so long as any refusal is not based upon the Policy.

### 3. Declaratory Relief

“The Court has authority under the APA to enter a declaratory judgment where it has vacated the underlying agency action.” *Duffy*, 2026 WL 588117, at *66. Pursuant to the Declaratory Judgment Act, courts may “declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.” 28 U.S.C. § 2201(a). In determining whether a declaratory judgment should issue, courts consider:

> (1) whether the declaratory judgment sought will serve a useful purpose in clarifying or settling the legal issues involved;
>
> (2) whether such a judgment would finalize the controversy and offer relief from uncertainty;
>
> (3) whether the proposed remedy is being used merely for procedural fencing or a race to res judicata;
>
> (4) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly

encroach on the domain of a state or foreign court;

(5) whether there is a better or more effective remedy; and

(6) whether concerns for judicial efficiency and judicial economy favor declining to exercise jurisdiction.

*Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 99-100 (2d Cir. 2023) (cleaned up).

A declaratory judgment will serve the salutary purposes of clarifying the respective rights of the parties to this litigation while offering relief from uncertainty. Although the Court has already granted vacatur, and thereby restored the prior status quo, "an order of vacatur would not necessarily have preclusive effect, in and of itself, in preventing the Secretary from taking action in the future." *Duffy*, 2026 WL 588117, at *66. Declaratory relief, by contrast, would establish not only why the Policy was unlawful under the APA in this case, but also why any similarly defective agency action would be unlawful under the APA. Such relief would therefore "avoid ambiguity regarding the respective rights [and obligations] of the parties." *Id.* Absent this relief, there is significant risk that this dispute will return in substantially the same form, requiring issues already thoroughly briefed and resolved to be revisited by this Court or another. That consideration alone also underscores the interests of judicial economy and efficiency that favor the issuance of declaratory relief. Furthermore, the Court's judgment will not intrude upon the authority of any state or foreign court, and there is no indication that the request for declaratory judgment is being used merely for procedural fencing. Accordingly, there is no more effective remedy in this case than a declaratory judgment paired

with vacatur.

## CONCLUSION

For the foregoing reasons, the parties' motions for partial summary judgment are both **GRANTED IN PART AND DENIED IN PART**.

The Court determines that there is no just cause for a delay of entry of judgment with respect to these claims. Accordingly, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk of Court is directed to enter partial judgment in Plaintiffs' favor on Counts One and Seven of the Complaint as set forth herein, and to enter partial judgment in favor of Defendants on Count Three of the Complaint. The motions are otherwise denied.

The judgment shall set aside and vacate the Policy categorically suspending the issuance of immigrant visas to applicants from the 75 designated countries as contrary to law and in excess of statutory authority. The judgment shall set aside and vacate any refusal of an immigrant visa that was based solely upon the Policy, and remand those agency actions for further proceedings consistent with this Opinion and Order.

The Clerk of Court is further requested to enter a declaratory judgment for Plaintiffs that Defendants, by ordering the suspension of the issuance of immigrant visas to nationals of specified countries, violated 8 U.S.C. § 1201(g), 8 U.S.C. § 1152(a)(1)(A), and 22 C.F.R. § 40.6. Additionally, the Policy exceeded the Secretary of State's authority under 8 U.S.C. § 1104(a).

By September 11, 2026, the parties shall submit a joint letter to the Court setting forth their proposals as to how to proceed with respect to the remaining claims in the case.

The Clerk of Court is directed to terminate ECF Nos. 47, 52, and 60.

SO ORDERED.

Dated: August 21, 2026
New York, New York

JEANNETTE A. VARGAS
United States District Judge