**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**Thurgood Marshall U.S. Courthouse 40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

# MOTION INFORMATION STATEMENT

**Docket Number(s):** 26-2573

Caption [use short title]

Catholic Legal Immigration Network Inc., et al. v. Marco Rubio, et al.

**Motion for:** Stay pending appeal

Set forth below precise, complete statement of relief sought:

Defendants seek a motion to stay the district court's Rule 54(b) judgment pending appeal and grant an administrative stay while considering this application.

**MOVING PARTY:** Appellant-Defendants

**OPPOSING PARTY:** Plaintiff-Appellees

☐ Plaintiff ☑ Defendant

☑ Appellant/Petitioner ☐ Appellee/Respondent

**MOVING ATTORNEY:** Susan Ansari

**OPPOSING ATTORNEY:** Erez R. Reuveni

[name of attorney, with firm, address, phone number and e-mail]

| Moving attorney | Opposing attorney |
|---|---|
| DOJ-Civil Division | Democracy Forward Foundation |
| P.O. Box 878, Ben Franklin Station | P.O. Box 34553 |
| Washington, D.C. 20044 | Washington, DC 20043 |

Court- Judge/ Agency appealed from: Judge Jeannette A. Vargas of the Southern District of New York

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes ☐ No (explain):

Opposing counsel's position on motion:
☐ Unopposed ☑ Opposed ☐ Don't Know

Does opposing counsel intend to file a response:
☑ Yes ☐ No ☐ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:**

Has this request for relief been made below? ☑ Yes ☐ No

Has this relief been previously sought in this court? ☐ Yes ☑ No

Requested return date and explanation of emergency: The Government will suffer irreparable harm if required to adjudicate the 43,000 visa applications belonging overwhelmingly to non-parties.

The government asks for a return date of October 16, 2026.

The government may seek sooner relief as the court has issued an Order to Show Cause.

Is oral argument on motion requested? ☑ Yes ☐ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set? ☐ Yes ☑ No If yes, enter date:

**Signature of Moving Attorney:**

/s/ Susan Ansari **Date:** 9/28/2026 Service by: ☑ CM/ECF ☐ Other [Attach proof of service]

**26-2573**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

---

CATHOLIC LEGAL IMMIGRATION NETWORK, INC., *et al.*,

*Plaintiffs-Appellees*,

v.

MARCO RUBIO, U.S. Secretary of State, *et al.*,

*Defendants-Appellants*.

---

On Appeal from the United States District Court
for the Southern District of New York
District Court Case 1:26-cv-00858-JAV

---

**EMERGENCY MOTION FOR STAY PENDING APPEAL AND IMMEDIATE ADMINISTRATIVE STAY**

---

BRETT SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

TYLER J. BECKER
*Counsel to the Assistant Attorney General*

MATTHEW P. SEAMON
*Assistant Director*

JULIAN KURZ
SUSAN ANSARI
*Trial Attorneys*
U.S. Department of Justice,
Civil Division
Office of Immigration
Litigation
P.O. Box 868,
Ben Franklin Station
Washington, DC 20044

# INTRODUCTION

For more than a century, the federal courts have recognized that the admission of foreign nationals into the United States is a "fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977). The Immigration and Nationality Act ("INA") confers substantial discretion on the Government to adjudicate visa applications and scrutinize applicants to ensure that visas are provided only to qualifying aliens that do not pose risks to public resources. Yet the district court below erroneously invalidated a January 14, 2026 U.S. Department of State Policy ("Policy") aimed at advancing those interests. The court's sweeping Rule 54(b) Judgment improperly set aside tens of thousands of non-party visa adjudications and remanded them for adjudication.

A stay is plainly warranted. The district court's rulings on both threshold and merits issues are profoundly flawed, and the Government is likely to succeed on the merits of this appeal. The court purported to conduct Administrative Procedure Act ("APA") review, but invalidated materials consisting of merely a public announcement and diplomatic communication, neither of which constitutes final agency action or produces any legal consequences. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Moreover, because the district court issued relief tethered to concrete refusals and non-issuances in individual visa cases, the doctrine of consular

nonreviewability independently forecloses review. *See Dep't of State v. Muñoz*, 602 U.S. 899, 908 (2024); *Am. Acad. of Religion v. Napolitano*, 573 F.3d 115, 123 (2d Cir. 2009). The court attempted to circumvent consular nonreviewability by reasoning that Plaintiffs challenged Department *policy*, rather than individual visa *refusals*. Yet the Judgment set aside thousands of visa refusals and remanded those visa cases for adjudication, Opinion ("Op.), ECF 83 at 24–25; Judgment, ECF 84 at 1, which consular nonreviewability squarely precludes that relief. *See Muñoz*, 602 U.S. at 908; *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159–60 (D.C. Cir. 1999).

The district court also badly erred in its evaluation of the merits. The court's conclusion that the Policy violates 8 U.S.C. §1104(a) misinterprets how that provision operates to divide the consular officer's grant-or-refusal function from the Secretary's supervisory authority. Indeed, the court's interpretation of this provision, if correct, would preclude any guidance to consular officials and squarely violate Article II by rendering them free of any executive oversight.

The court likewise misconstrued 8 U.S.C. §§1152(a)(1)(A), 1201(g) and 22 C.F.R. §40.6. The invalidated documents do not create a freestanding nationality-based ground of inadmissibility, establish a parallel refusal mechanism, or replace the consular officer as the statutory decisionmaker. Rather, they operate through the same issuance-or-refusal framework that Congress enacted which gives unreviewable discretion on consular officers—under guidance issued from the State

Department—to decline to issue visas until the inadmissibility grounds are satisfied. *See* 8 U.S.C. §§1152(a)(1)(A), 1182(a)(4), 1201(g); *Trump v. Hawaii*, 585 U.S. 667, 695 (2018). Nor do they disregard 22 C.F.R. §§40.6 or 42.81 or the Department's issue-or-refuse framework; any refusal still must be entered under existing statutory authority in the individual case.

The district court further erred by entering overbroad relief. The court's sweeping Judgment reaches thousands of individual consular refusals, extending far beyond the refusals involving individual Plaintiffs in this case. 5 U.S.C. §706 does not authorize the court to take over the operation of the immigrant-visa system, and any injunction must remain within traditional equitable limits and be tailored to provide complete relief to the plaintiffs before the court. *See Trump v. CASA, Inc.*, 606 U.S. 831, 841–47, 852–54 (2025). The injunctive aspects of the court's order that run to non-parties cannot stand under *CASA*. At minimum, the vacatur should be stayed as to non-parties, as doing so will cause no harm to Plaintiffs and the equities favor the Government.

On September 25, 2026, the court denied Defendants' motion for stay pending appeal. ECF No. 109; F.R.A.P. § 8(a)(2)(A)(ii). Absent a stay, the Judgment will irreparably harm the Department by requiring reconsideration of more than 43,000 Policy-only refusals, consuming finite consular capacity, while remanded applications may proceed to visa issuance and admission before the Department

completes its public-charge training and deployment of updated adjudication tools. Armstrong Decl. ¶¶6–8. Many of these harms cannot be repaired by a later favorable judgment—indeed, once a visa is issued the harm to the United States cannot be undone. Together with the substantial appellate issues presented, these serious harms warrant a stay while appellate review proceeds. At minimum, this Cout should stay the refusal-vacatur and remand relief, and stay the vacatur insofar as it applies to nonparties.

## BACKGROUND

### A. Visa Adjudication Framework

The INA and implementing regulations govern adjudication of immigrant visas. An intending immigrant residing abroad generally applies through the ordinary consular process, under which the applicant submits the required materials and then appears before a consular officer at a designated consular post. *See* 8 U.S.C. §§1202(a), (b); 22 C.F.R. §§42.61, 42.71; 9 FAM 501.1-1(c), 504.1-2.

That framework assigns consular officers the adjudicatory role in individual immigrant-visa cases. Once an application has been properly completed and executed before a consular officer, the officer must either issue the visa or refuse it under governing law. *See* 8 U.S.C. §1201(g); 22 C.F.R. §§40.6, 42.81(a); 9 FAM 504.9-2, 504.11-2(A). A visa may be refused only on grounds set out in the INA or implementing regulations, and when a visa is not issued, that result is reflected

through the existing refusal process in the individual case. *See* 22 C.F.R. §§40.6, 42.81(b); 9 FAM 504.11-2(A).

One such ground of inadmissibility is when, "in the opinion of the consular officer," the applicant is "likely … to become a public charge." 8 U.S.C. §1182(a)(4)(A); *see* 22 C.F.R. §40.41.

**B. The January 14 Announcement and Implementing Cable**

The Judgment invalidated two January 14, 2026 State Department materials. The first is a public-facing announcement titled "Immigrant Visa Processing Updates for Nationalities at High Risk of U.S. Public Benefits Reliance." Compl., Ex. A. The announcement states the Department was conducting "a full review" of screening and vetting policies and that, effective January 21, 2026, the Department had "paused all visa issuances" to immigrant-visa applicants who are nationals of specified countries. *Id.*

The second is an implementing cable from the Secretary of State to consular posts, with the subject line "Pausing Immigrant Visa Issuances for Nationalities at High Risk of Public Charge." Compl., Ex. B. The cable identifies itself as an "action request" and directs that, effective January 21, 2026, consular officers "must refuse under Section 221(g)" immigrant-visa applicants from listed countries who have not otherwise been refused under another ground of ineligibility. *Id.* ¶2. At the same time, the cable instructs that interview appointments for affected applicants "should

not be canceled," consular officers should "continue to adjudicate all immigrant visa cases," and officers should "carefully evaluate all potentially applicable grounds of eligibility," including whether an applicant is inadmissible under INA §212(a)(4). *Id.* ¶4. The cable also provides that previously issued visas are not to be revoked pursuant to the guidance and remain valid for travel. *Id.* ¶9.

### C. Implementation Through Individual Consular Adjudications

Implementation of the invalidated materials occurs through the ordinary consular adjudicatory process. Under governing regulations and Foreign Affairs Manual provisions, immigrant-visa applicants continue to submit applications, appear for interviews, and receive case-specific adjudications by consular officers. *See* 22 C.F.R. §§42.61, 42.81; 9 FAM 501.1-1(c), 504.9-2, 504.11-2(A). The implementing cable likewise contemplates continued case-specific consular adjudication rather than a freestanding Department-level disposition. Ex. B ¶4.

When a visa is not issued, the operative consequence is entered through the existing refusal mechanism in the individual case. The implementing cable instructs officers first to assess other potentially applicable grounds of ineligibility; if an officer determines the applicant is inadmissible under the public-charge ground, the officer should refuse under INA §212(a)(4), and if the officer has not refused the applicant under another ground, the officer should enter a refusal under INA §221(g). *Id.* ¶¶4–5. The same is true for already approved but unprinted cases: the

cable instructs the consular officer to reopen the case and enter a §221(g) refusal, while providing that previously issued visas are not revoked and remain valid for travel. *Id.* ¶9.

The January 14 announcement and implementing cable thus function through later, case-specific action by consular officers in individual adjudications, using the existing issuance-or-refusal framework at the consular post.

**D. The District Court's Judgment**

On August 24, 2026, the district court granted partial summary judgment to Plaintiffs and partial final judgment under Rule 54(b). ECF Nos. 83, 84. The court ruled that the January 14 announcement and implementing cable constitute final agency action and that the Policy is therefore reviewable and final. Op.22–29. With respect to the merits, the court concluded that the Policy violated several INA provisions, specifically 8 U.S.C. §§1104(a), 1152(a)(1)(A), and 1201(g), and thus was contrary to law. *Id.* at 30-52. The court noted the Secretary lacks authority to control consular officers' final visa-granting decisions under §1104(a). By directing that officers "must refuse" visas to nationals of 75 countries regardless of eligibility, the court ruled the Secretary usurped the decision-making power Congress reserved to consular officers. *Id.* at 34–44. The court further determined the Policy "requires consular officers to discriminatorily refuse visas solely on the basis of the applicant's nationality," in violation of §1152(a)(1)(A)'s prohibition on nationality-based

discrimination in the issuance of immigrant visas. *Id.* at 34-37. The court also concluded the Policy violates §1201(g) and 22 C.F.R. §40.6 by overriding consular officers' responsibility to make individualized determinations and contradicting the rule that visas may be refused only on grounds specifically set out in law.[1]

The Judgment vacates the Policy, sets aside "any refusal of an immigrant visa that was based solely upon the Policy," remands "those agency actions for further proceedings," and enters declaratory relief. Judgment at 1–2. The refusal vacatur "does not extend to denial of immigrant visas on any ground other than the Policy," Op.57. On remand the Court "does not direct any particular outcome or process so long as any refusal is not based upon the Policy," *id.* at 58. More than 43,000 immigrant-visa applications were refused solely under the Policy and are therefore subject to the court's vacatur and remand order. Armstrong Decl. ¶7. Independently of the vacated Policy, the Bureau of Consular Affairs has begun deploying updated public-charge training, adjudication tools, and guidance worldwide. *Id.* ¶6.

## STANDARD OF REVIEW

In deciding whether to grant a stay pending appeal, courts consider likelihood of success, irreparable injury to the movant, injury to other parties, and public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). A movant relying on a threshold

[1] The district court concluded the Policy did not violate 8 U.S.C. § 1182(a)(4) nor needed to undergo notice and comment. Op.31–34, 44–50.

or remedial defect in the relief entered need not show that it will prevail on every merits question. *See Trump v. CASA, Inc.*, 606 U.S. 831, 860 (2025) ("That is not how the *Nken* factors work.").

## ARGUMENT

### I. Defendants are Likely to Prevail on the Merits

#### A. Plaintiffs' Claims Are Not Reviewable

**1.** The district court's Judgment depends on treating two State Department materials—a public announcement and a diplomatic cable—as if they themselves issued or denied visas, displaced the INA's existing adjudicatory structure, and effected legal consequences apart from later consular action. They do not. Under the Policy, immigrant-visa applications continue to be processed through ordinary consular adjudications, and any refusal is entered under existing legal authorities in the individual case. *See* 8 U.S.C. §§1182(a)(4), 1201(g); 22 C.F.R. §§40.6, 42.81.

That threshold error is dispositive of Plaintiffs' claims. Under the APA, only final agency action is reviewable; the challenged action itself must determine rights or obligations or produce legal consequences. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). But the materials invalidated by the court consist of a public announcement and diplomatic communication, neither of which satisfy either prong of the *Bennett v. Spear* test.

*First*, neither marks the "consummation of the agency's decisionmaking process." *Bennett*, 520 U.S. at 178. The cable is an internal procedural directive

directing agency personnel how to proceed when adjudicating visa applications. Likewise, the announcement is merely a public explanation of the Policy. They are therefore "interlocutory" in nature, and are at most a "prerequisite to a definitive agency action" that does not constitute final agency action under this Court's precedent. *Top Choice Distribs. v. USPS*, 138 F.3d 463, 466 (2d Cir. 1998). *Second*, neither is agency action from "which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178. As a public statement, the announcement has no legal consequences whatsoever. And any legal consequences from the cable would come from the consular officer's subsequent decision to refuse the visa—assuming that occurs at all. Although it contains mandatory instructions to posts, it operates through later consular action in individual cases. The cable directs officers how to proceed within ongoing adjudications, including to assess other possible grounds first and, where no other ground applies, to enter a case-specific §221(g) refusal in the individual case. Ex. B ¶¶4–5, 9. The legal consequence thus arises only when a consular officer records a refusal in a specific adjudication. The court fundamentally erred by treating such materials as final agency action, and did so to evade principles of consular nonreviewability, which preclude review of the only final agency action at issue here: the refusal of a visa.

**2.** Furthermore, the consular nonreviewability doctrine applies to Plaintiffs'

challenge and the remedy ordered below. The district court sustained review on an expressly policy-only premise. Plaintiffs, the court determined, challenged "final, Department-level policies and agency actions" and "d[id] not seek review of any consular officer's issuance or refusal of any particular visa." Op.24 (quoting Compl. ¶24). But, as a prospective matter, it is unclear whether the Policy has any impact until there is a final visa refusal—*i.e.*, a policy-only refusal. So the only final agency action Plaintiffs can challenge is the denials, and consular nonreviewability precludes review of them.

The immigration laws do not authorize review of "a consular officer's denial of a visa," and "[t]he Judicial Branch has no role to play unless expressly authorized by law." *Muñoz*, 602 at 908. The APA directs reviewing courts to "hold unlawful and set aside" agency action that fails the standards prescribed by the statute, 5 U.S.C. §706(2), but that remedial instruction does not override preexisting limitations on judicial review of consular visa decisions. *Muñoz*, 602 U.S. at 908.This court has repeatedly applied that principle. *See, e.g., Chen v. Rubio*, 158 F.4th 393, 395–97 (2d Cir. 2025) (visa denials "are insulated from judicial review").

Even accepting the district court's tortured logic with respect to Plaintiffs' claims, the *relief* issued clearly violates consular nonreviewability. The Judgment set aside every refusal resting solely on the Policy and remanded those adjudications—dispositions entered by individual consular officers in individual

cases, belonging overwhelmingly to nonparties. Judgment at 1; *see* Op.55–56. The court took pains to emphasize its Judgment does not review the merits of any consular officer's eligibility determination and directs no particular outcome or process on remand. Op.58. The court also concluded that, under the Policy, "[t]he outcome is predetermined." Op.42.

But neither point resolves whether a court may nullify completed consular refusals after sustaining review on the premise that the challenge is directed to a Department-level policy rather than particular visa decisions. The Judgment does exactly that: it sets aside completed Policy-only refusals and requires their re-adjudication. Judgment at 1–2. The court's misguided attempt to fashion a "policy" exception to consular nonreviewability therefore fails. Treating a completed refusal as reviewable whenever Department guidance constrains the officer's decision would make the scope of consular nonreviewability depend on the merits of the challenge to the underlying policy, an approach that is both theoretically unsound and practically unworkable. Moreover, it would defeat the purpose of the doctrine and involve courts in delicate matters impacting admission to the country that are far outside the judicial ken.

### B. The State Department's Policy and Visa Refusals Are Not Contrary to Law

Even if review were available, the district court's conclusion that the State Department's Policy and visa refusals are contrary to law is fundamentally wrong

and raises serious constitutional questions.

**1.** The court misconstrued 8 U.S.C. §1104(a). The question here is whether the exception for functions "conferred upon the consular officers relating to the granting or refusal of visas," 8 U.S.C. §1104(a), reaches every Department-level instruction bearing on visa adjudication, or only measures that control the consular officer's grant-or-refusal determination. Although the consular officer remains the statutory visa decisionmaker, it does not follow that every Department-wide instruction bearing on visa processing is unlawful. Indeed, were that the case, it would be unlawful for the Department to provide any guidance to consular officers, which is not and has never been the law. Such a scenario would squarely violate Article II by eliminating oversight over consular officials and transforming them into principal officers never confirmed by the Senate.

*Janay*, which the court relied on, recognizes the distinction between control over the grant-or-refusal decision and other forms of Secretarial direction. The court quoted *Janay* for the Secretary's lack of "authority to control which visa applications consular officers grant or deny," Op.44, but *Janay* acknowledges that "nothing in §1104(a) limits the Secretary's authority" to issue instructions for carrying out the INA. *Janay v. Blinken*, 743 F. Supp. 3d 96, 106, 109-10 (D.D.C. 2024).

Reading §1104(a) the way the court did would raise grave constitutional concerns. Section 1104(a) cannot be read to provide consular officials unreviewable

discretion in the visa-issuance process. Such officials are inferior officers who must remain subject to constitutionally sufficient supervision, otherwise they would need to be appointed as principal officers by the President and confirmed by the Senate. *See United States v. Arthrex, Inc.*, 594 U.S. 1, 11-17 (2021); *Yaghoubnezhad v. Stufft*, 734 F. Supp. 3d 87, 98 n.3 (D.D.C. 2024) ("[C]onsular officers are inferior officers[.]"). Congress obviously contemplated this problem by enacting 6 U.S.C. §236 in the Homeland Security Act of 2002. Section 236(a)(1) makes plain that the Secretary of DHS possesses "all authorities to ... enforce the provisions" of the INA "relating to the functions of consular officers ... in connection with the granting or refusal of visas" and to confer those functions on the Secretary of State, §236(a)(2). That provision also states "the Secretary of State may direct a consular officer to refuse a visa to an alien if the Secretary of State deems such refusal necessary or advisable in the foreign policy or security interests of the United States." 6 U.S.C. §236(c)(1).

Under that provision, "the Secretary of State retains the authority to direct the consular office to refuse a visa." *Atiffi v. Kerry*, 2013 WL 5954818, at *1 n.5 (N.D. Cal. Nov. 6, 2013). The provision makes plain, in §236(d), that it does not "alter or effect ... the authority of a chief of mission under" 22 U.S.C. §3927, which itself gives the chief of mission, "[u]nder the direction of the President ... full responsibility for the direction ... of all Government executive branch employees in

that country." 22 U.S.C. §3927(a). In other words, Congress repeatedly has given supervisory officials the authority to give direction to consular officers regarding how they adjudicate visas. Accordingly, the Secretary had ample statutory authority to direct the non-issuance of visas in the foreign policy interests of the United States and to not admit aliens on visas who may become public charges until the Department can implement improved procedures to evaluate those aliens. ECF 63 at 2 ("The Department is undergoing a full review of all policies, regulations, and guidance to ensure the highest level of screening and vetting of every visa applicant.").

**2.** The court's reading of 8 U.S.C. §1152(a)(1)(A)is wrong. Defendants do not dispute that provision's antidiscrimination command, but it cannot be read in isolation from the rest of the INA. Sections 1182 and 1152 "operate in different spheres": §1182 defines who is admissible and therefore eligible to receive a visa, while §1152(a)(1)(A) prohibits discrimination in the allocation of immigrant visas. *Hawaii*, 585 U.S. at 695. Reading §1152 to reach guidance implemented through ordinary, officer-entered adjudications would convert an antidiscrimination rule governing visa allocation into a silent override of the INA's broader adjudicatory framework. The district court's historical discussion relies substantially on a recent district-court decision and a concurrence in a Fourth Circuit decision later vacated by the Supreme Court—neither of which addressed how §1152 operates alongside

the INA's separate admissibility and refusal provisions. Op.34–36 (citing *Dorcas Int'l Inst. of R.I. v. USCIS*, 2026 WL 1622708, at *46 (D.R.I. June 5, 2026), and *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 338–40 (4th Cir. 2018) (Wynn, J., concurring), *vacated on other grounds*, 585 U.S. 1028 (2018)). Although *Hawaii* did not decide the validity of a nationality-based issuance policy, its statutory-structure analysis supports Defendants' narrower argument that §1152 must be read in harmony with those separate provisions. *See Hawaii*, 585 U.S. at 695.

**3.** The district court further erred in its construction of 8 U.S.C. §1201(g) and 22 C.F.R. §40.6. The court ruled that §1201(g) permits refusal only when a consular officer finds statutory ineligibility or application noncompliance, and concluded that the Policy unlawfully required §1201(g) refusals when no other refusal ground applied. Op.38–41. That analysis gives insufficient effect to the INA's existing refusal framework. Section 1201(g) supplies the statutory mechanism for nonissuance when the consular officer is not convinced the applicant is entitled to a visa, and the regulations expressly recognize refusal under §1201(g) as an available disposition after a consular officer reviews a completed application. 8 U.S.C. §§1201(g), 1202(b); 22 C.F.R. §42.81(a). Indeed, the court rejected Plaintiffs' contention that the Policy violated §42.81. Op.41 n.9. The court thus gave insufficient weight to the distinction between creating a new substantive ground of inadmissibility and directing consular officers to use the refusal mechanism that

Congress and the regulations already supplied. And, as discussed *supra*, even if the cable directly compels non-issuance of visas, Congress provided specific statutory authority for the Secretary of State to direct consular officers to refuse to issue visas. The court's contrary interpretation would raise grave constitutional concerns.

The Government is thus likely to succeed on the merits of this appeal.

## II. The Equities Favor a Stay

The Judgment will irreparably harm the Government absent a stay, and the remaining factors, including the court's order to show cause, favor the Government as well. ECF No. 108.

**1.** Whenever a court issues broad relief against an Executive Branch policy, the United States suffers a form of irreparable harm. *See CASA*, 606 U.S. at 860-861; *Trump* v. *California*, No. 26A124, 2026 WL 2473573, at *4 (Aug. 24, 2026) (lower-court errors that "deal 'a serious setback' to the Executive's 'goals'" and are an "intrusion into the Executive[]'s internal operations" constitute "irreparable harm" warranting a stay). That harm is particularly acute here, where a judicial order undermines the Executive's inherent constitutional authority over the admission of aliens. *See Landon v. Plasencia*, 459 U.S. 21, 32 (1982) ("[T]he power to admit or exclude aliens is a sovereign prerogative."). The Judgment thus reflects

an “unwarranted judicial interference in the conduct of foreign policy.” *Kiobel* v. *Royal Dutch Petroleum*, 569 U.S. 108, 116 (2013).

Furthermore, absent a stay, some remanded applications may proceed to visa issuance and admission before the Department completes the updated public-charge training and adjudication tools described above, including applications that otherwise would have resulted in findings of public-charge ineligibility. Armstrong Decl. ¶¶6, 8. Once an applicant is admitted, restoring the pre-issuance posture would generally require separate, resource-intensive removal proceedings and may not fully undo the resulting harms. *Id.* ¶9. In granting vacatur, the court observed the Government had offered “no indication” that vacatur would substantially disrupt visa issuance or other Department efforts. Op.55. But the Government presented evidence of the significant operational consequences with its stay motion, the first time the Government bore the burden to demonstrate harm. Armstrong Decl. ¶7.

Reconsideration of a Policy-only refusal is not a matter of clearing an administrative-processing flag. Reconsideration of the more than 43,000 affected applications requires consular officers to re-review applicants’ files, request updated documentation where expired, potentially schedule a new interview if required in the consular officer’s discretion, and issue a new determination. Armstrong Decl. ¶7. The Cable shows why updated documentation may be necessary. Although it directed officers to assess all other grounds of ineligibility first, it also provided that

"time-limited documents like police clearances and medicals are not necessary for a 221(g) refusal related to the immigrant visa issuance pause." Compl., Ex. B. at 4. Plaintiffs say the Policy came with "a built-in unwind process" because affected applicants were assessed on other grounds and tagged. ECF 91 at 2. The tag makes the relevant cases identifiable, but does not eliminate the individualized work required to reconsider them. Because consular sections have finite interview appointment capacity, reconsideration of these cases necessarily diverts consular adjudication and security-vetting resources away from other applicants, including applicants whose cases have been pending for a comparable or longer period or who face statutory deadlines, delaying those cases and straining the Department's limited staff and resources. Armstrong Decl. ¶7.

Many applications re-adjudicated during appeal will proceed to visa issuance and admission before the Department completes its updated public-charge training and adjudication tools. Armstrong Decl. ¶8. As a result, some applicants who otherwise would have been found ineligible on public-charge grounds will instead be issued visas under existing procedures. *Id.* To be clear, the Government does not contend that visa issuance or admission is necessarily irreversible: consular officer or the Secretary of State may "at any time, in his discretion, revoke such visa or other documentation," 8 U.S.C. §1201(i), and "[t]he authority to revoke an immigrant visa and, by extension, the lawful permanent resident status achieved thereby, rests with

the Secretary of State," *Adams v. Holder*, 692 F.3d 91, 99 (2d Cir. 2012). But if a visa holder has already been admitted as a lawful permanent resident, restoring the pre-issuance status quo would generally require separate, resource-intensive removal proceedings that are not certain to restore that posture. Armstrong Decl. ¶9. Some applicants who otherwise would have been found ineligible following the updated procedures will be eligible to obtain public benefits after admission, and that support provided in the interim is not easily or readily recovered. *Id.* These harms cannot be fully undone without additional after-the-fact enforcement. *Id.*

**2.** The balance-of-harms and public-interest merge when the Government is a party. *New York v. DHS*, 969 F.3d 42, 58–59 (2d Cir. 2020). As to the U.S.-citizen Plaintiffs, the district court identified the "real-world effect that the [Policy] has had in keeping them separated from certain relatives." But there is no right to be united—in *this* country—with relatives who are citizens of other countries, as the Supreme Court has held. *See Muñoz*, 602 U.S. 899. As to the intending-immigrant Plaintiffs, the court explained that the impact was the "lost opportunity" to receive an immigrant visa. Op.19. But that is not correct—once public charge guidance is finalized, these applicants, who normally must wait for many years for a visa in any event, will be able to finalize their applications under the newly revitalized public charge assessment. Although this will understandably place burdens on Plaintiffs, those burdens must be balanced against the difficulty of restoring the pre-admission

posture, the diversion of finite consular capacity from other pending cases, and the risk of public-resource expenditures that cannot readily be recovered once applicants have been admitted. Armstrong Decl. ¶¶7–9.

### III. In the Alternative, the Court Should Stay the Vacatur and Remand of Policy-Only Refusals, at Least as to Nonparties

If the Court does not stay the Judgment in its entirety, it should at least stay the portions setting aside Policy-only refusals and remanding those refusals and applications. Stay relief may be tailored to the portion of a judgment for which the movant has made the requisite showing. In *CASA.*, the Supreme Court partially stayed the injunctions "only to the extent that" they were "broader than necessary to provide complete relief to each plaintiff with standing to sue." 606 U.S. at 861–62; *see also Nken*, 556 U.S. at 433 (the stay inquiry calls for "individualized judgments in each case"). Moreover, "[c]omplete relief is not a guarantee—it is the maximum a court can provide." *CASA*, 606 U.S. at 854. This Court has likewise affirmed the denial of a stay where the district court nevertheless stayed one component of the relief. *See United States v. Grote*, 961 F.3d 105, 122–23 (2d Cir. 2020). And even if universal vacatur is appropriate under the APA, that relief must be stayed pending appeal as to non-parties since granting such a stay will cause no harm to Plaintiffs but will resolve most of the significant harm imposed on the Government while this appeal plays out. *See Nken*, 556 U.S. at 434.

The refusal-vacatur and remand relief should at minimum be stayed insofar as it applies to non-parties. Doing so will cause no harm to Plaintiffs and the balance of equities necessarily steers dispositively toward the United States. The Judgment reaches more than 43,000 individual consular refusals, extending far beyond refusals involving the individual Plaintiffs in this case. Armstrong Decl. ¶7. *CASA* underscores the equitable concern, at the stay stage, with relief extending beyond the parties. This is an inquiry needed in addressing our request for a stay irrespective of whether the APA authorizes universal vacatur of agency action. 606 U.S. at 847 n.10, 861. The Supreme Court has repeatedly emphasized courts must tailor relief to the injury established by the *parties*. *See, e.g.*, *Murthy v. Missouri*, 603 U.S. 43, 61 (2024). *CASA* likewise underscores the need to carefully consider the proper scope of relief, particularly where the challenged agency action implicates broad questions of federal policy and administration. 606 U.S. at 847 n.10, 856. Therefore, the vacatur Judgment must be stayed with respect to non-parties, including the nullification of thousands of nonparty consular adjudications.

Even apart from the relief's application to nonparties, the Judgment should be stayed to the extent it sets aside and remands Policy-only visa refusals. The requested partial stay is readily separable from the remainder of the Judgment. The Judgment separately vacates the Policy, sets aside "any refusal of an immigrant visa that was based solely upon the Policy," remands "those agency actions for further

proceedings," and enters declaratory relief. Judgment at 1–2. Staying only the vacatur and remand of Policy-only refusals therefore would leave the Policy itself vacated and the declaratory judgment intact; no new refusal could rest on the Policy. The partial stay would simply preserve the status of the Policy-only refusals pending appellate review of whether the court erred by setting aside those consular adjudications and requiring their reconsideration. It also would directly address operational harms arising from reopening and re-adjudicating Policy-only refusals. Armstrong Decl. ¶7.

## CONCLUSION

For the foregoing reasons, this Court should stay the district court's Rule 54(b) Judgment pending appeal and grant an administrative stay while considering this application.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

TYLER J. BECKER
Counsel to the Assistant Attorney General

MATTHEW P. SEAMON
Assistant Director

/s/ *Susan Ansari*
SUSAN ANSARI
Trial Attorney
U.S. Department of Justice
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 532-5537
Susan.ansari2@usdoj.gov

JULIAN KURZ
Trial Attorney

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the abovenamed counsel hereby certifies that this memorandum complies with the type-volume limitation of the Federal Rules of Appellate Procedure. As measured by the word processing system used to prepare it, this memorandum contains 5,200 words.